# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| MATT PASQUINELLI and BRYAN PAYSEN, Individually and on Behalf of All Others Similarly Situated, | Case No.: 1:23-cv-00743-JLH |
| Plaintiffs, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| HUMBL, LLC, BRIAN FOOTE, JEFFREY HINSHAW, GEORGE SHARP, KAREN GARCIA, MICHELE RIVERA, and BF BORGERS CPA, PC, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Co-Lead Plaintiffs Alfred Miller and Matt Pasquinelli ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint ("Complaint") against HUMBL, LLC ("HUMBL" or the "Company"), its Chief Executive Officer ("CEO") Brian Foote ("Foote"), Chief Financial Officer ("CFO") Jeffrey Hinshaw ("Hinshaw"), Capital Markets Advisor George Sharp ("Sharp"), Vice President ("VP") of Major Accounts Karen Garcia ("Garcia"), and VP of Global Partnerships Michele Rivera ("Rivera"), and auditor BF Borgers CPA PC ("BF Borgers") (together with HUMBL, the "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own acts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in possession of Defendants.

## NATURE OF THE CASE

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired (1) HUMBL common stock between November 21, 2020 and November 17, 2021; and/or (2) the unregistered HUMBL ETX securities between November 21, 2020 and February 14, 2022, all dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities

laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and/or §§ 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act").

2.      Throughout the Class Period, Defendants made materially false and/or misleading statements regarding HUMBL's business and operations. Specifically, Defendants made material misstatements and/or failed to disclose that: (1) the HUMBL Pay App did not have even the basic functionality it promised to investors; (2) as a result, the Company could not and did not follow through on the international business partnerships it touted to be able to generate revenue through them; and (3) the Tickeri acquisition was overvalued by at least $12M, which misleadingly conveyed a strong balance sheet until the goodwill related to the acquisition was impaired as of June 30, 2021. As a result, HUMBL's public statements were materially false and/or misleading at all relevant times.

3.      Defendants also sold a series of highly speculative unregistered securities called BLOCK Exchange Traded Index ("ETXs") products and related BLOCKS digital assets. These products purported to "simplify digital asset investing" for customers seeking exposure to cryptocurrency investments. Instead, they were unregistered securities that were collateralized by a variety of highly speculative and risky digital assets.

4.      Lastly, Defendants engaged in and financially benefitted from a multifaceted scheme that relied on materially false statements and/or omissions about stock ownership, share count restrictions and reductions, dilution probability, global partnerships, functionality and geographic reach of the HUMBL platform, and the undisclosed use of paid promotors.

5.      As a result of Defendants' wrongful acts, omissions, and scheme, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC

(17 C.F.R. §240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act.

8.     Venue is proper in this Judicial District pursuant to Section 7.13 of HUMBL's bylaws, which includes a provision selecting the federal district courts of the United States situated in the State of Delaware as the forum for all federal securities lawsuits against it. Further, HUMBL is a Delaware corporation.

9.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Plaintiffs

10.    Plaintiffs, as set forth in their previously-filed Certifications (ECF Nos. 10-4 and 13-3), acquired HUMBL securities, including HUMBL common stock and/or ETX products, at artificially inflated prices during the Class Period in reliance on the alleged false and/or misleading statements and/or on the integrity of the market price, and suffered economic losses when true facts about the Company's business operations and future prospects were disclosed and the artificial inflation was removed from the price of HUMBL securities.

11.    Plaintiff Alfred Miller is a resident and citizen of Texas, living in San Antonio, Texas. Plaintiff Miller purchased HUMBL common stock in reliance on the alleged false and/or misleading statements and/or on the integrity of the market price, and suffered investment losses as a result of Defendants' conduct.

12.    Plaintiff Matt Pasquinelli is a resident and citizen of Pennsylvania, living in Canonsburg, Pennsylvania. Plaintiff Pasquinelli purchased HUMBL common stock as well as unregistered BLOCK ETX securities in reliance on the alleged false and/or misleading statements and/or on the integrity of the market price, and suffered investment losses as a result of Defendants' conduct.

**B.    Defendants**

13.    Defendant HUMBL LLC is a Delaware corporation with its principal executive offices located at 600 B Street, Suite 300, San Diego, CA 92101. The Company's common stock trades in the over-the-counter ("OTC") markets ("OTCMKT") under the ticker symbol "HMBL" and its unregistered securities, the BLOCK Exchange Traded Index products, are known as "BLOCK ETXs." During the Class Period, HUMBL was covered by financial analysts including Gold Panda, who has been a Seeking Alpha Analyst since 2017[1], and Josh J. Kim, who has been a Seeking Alpha Analyst since 2021[2].

14.    Most, if not all, of the publicly available information about HUMBL from its public statements in SEC filings, press releases, and Twitter during the Class Period was reflected in the price of its stock and its BLOCK ETXs, which were collected, organized, and disseminated by electronic platforms such as Seeking Alpha[3] and OTC Markets Group[4]. Indeed, the OTC Markets Group still identifies HUMBL as "Transfer Agent Verified", meaning that the Company's transfer agent has been verified as reliable and trustworthy and that the data disseminated through the OTC Markets Group's market data was fed to investors and broker-dealers. *Id*. Accordingly, investors had the ability to review the publicly disseminated information and the opportunity to trade at informed, and therefore appropriate, bid and asked prices during the Class Period.

15.    Defendant Foote is a resident and citizen of California, living in San Diego, California. Foote has served as HUMBL's CEO and Chairman of its Board of Directors ("Board") at all relevant times.

16.    Defendant Hinshaw is a resident and citizen of California, living in San Diego, California. Hinshaw has served as HUMBL's CFO and a Director on its Board at all relevant times.

17.    Defendant George Sharp is a resident and citizen of Arizona, living in Scottsdale, Arizona. Sharp previously served as an advisor to HUMBL and currently serves as Capital Markets

---

[1] https://seekingalpha.com/author/gold-panda
[2] https://seekingalpha.com/author/josh-j-kim
[3] https://seekingalpha.com/symbol/HMBL
[4] https://www.otcmarkets.com/stock/HMBL/overview

Advisor.

18.    Defendant Rivera is a resident and citizen of California, living in San Diego, California. Rivera has served as HUMBL's VP of Global Partnerships and a Director on its Board at all relevant times.

19.    Defendant Garcia is a resident and citizen of California, living in San Diego, California. Garcia has served as HUMBL's Vice President of Major Accounts at all relevant times.

20.    Defendants Foote, Hinshaw, Sharp, Rivera and Garcia are sometimes referred to herein as "Individual Defendants."

21.    The Individual Defendants possessed the power and authority to control the contents of HUMBL's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of HUMBL's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with HUMBL, and their access to material information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

22.    Defendant BF Borgers CPA PC ("BF Borgers"), a Colorado limited liability company that provides auditing and consulting services to public and private companies, was HUMBL's independent registered public accounting firm from 2021 until May 8, 2024[5], and issued reports on HUMBL's financial statements during that time. Various partners of BF Borgers participated in the audits of HUMBL during that time, preparing, reviewing, approving, and directing the production of financial statements, reports and releases issued or disclosed by

---

[5] HUMBL, Inc., SEC Form 8-K (May 8, 2024),
https://www.sec.gov/ix?doc=/Archives/edgar/data/1119190/000149315224018700/form8-k.htm
("5.8.24 8-K").

HUMBL during the Class Period.

23.    Throughout the Class Period, BF Borgers served as HUMBL's "independent auditor" and issued clean and unqualified audit opinion letters in connection with HUMBL's financial statements, which were incorporated with BF Borger's approval in HUMBL's public statements. BF Borger and various of its individual partners participated in the audits of HUMBL for the 2022 and 2023 fiscal years, and prepared, reviewed, approved and directed the production of financial statements, reports and releases issued or disclosed by HUMBL during the Class Period. The audit report of HUMBL for the fiscal years ending December 31, 2022 and 2023 only contained a single "explanatory paragraph regarding their substantial doubt as to [HUMBL's] ability to continue as a going concern, and the lack of any adjustments to the financial statements that might result from that circumstance." *Id*. If BF Borger had conducted an audit of HUMBL which complied with Public Company Accounting Oversight Board ("PCAOB") standards, it would not have issued clean and unqualified audit opinion letters in connection with the Company's financial statements.

24.    At all relevant times, BF Borger was the purported "independent" auditor of, and provided other tax and accounting services to, HUMBL. BF Borger audited HUMBL's materially false and misleading financial statements during the Class Period and issued materially false and misleading opinions on these financial statements. BF Borger also consented to the use of its unqualified opinion on HUMBL's financial statements and reports filed with the SEC and otherwise disseminated to the investing public during the Class Period. These financial statements were incorporated into and made a part of the Company's public filings with the knowledge and express consent of BF Borger during the Class Period.

25.    BF Borgers, under the direction of its audit partners, audited HUMBL's materially false and misleading financial statements during the Class Period and issued materially false and misleading opinions on those financial statements. BF Borger reviewed, prepared, directed and controlled all public financial disclosures, including public filings, statements to the press and investing public, earnings releases, and press releases relating to financial issues made by HUMBL

during the Class Period. BF Borgers thus participated in the scheme, plan and common course of conduct described herein.

26.    On May 9, 2024, HUMBL retained Fruci & Associates II, PLLC ("Fruci") as its auditor after the SEC charging BF Borgers and its owner on May 3, 2024 with "deliberate and systemic failures to comply with [PCAOB] standards in its audits and reviews incorporated in more than 1,500 SEC filings from January 2021 through June 2023" and among other things, "fabricating audit documentation to make it appear that the firm's work did comply with PCAOB standards."[6] "To settle the SEC's charges, BF Borgers agreed to pay a $12 million civil penalty, and Benjamin Borgers agreed to pay a $2 million civil penalty[,]" and both "agreed to permanent suspensions from appearing and practicing before the [SEC] as accountants." *Id*. As then-Director of the SEC's Division of Enforcement noted, "Because investors rely on the audited financial statements of public companies when making their investment decisions, the accountants and accounting firms that audit those statements play a critical role in our financial markets. Borgers and his firm completely abandoned that role, but thanks to the painstaking work of the SEC staff, Borgers and his sham audit mill have been permanently shut down." *Id*.

## SUBSTANTIVE ALLEGATIONS

### A.    General Background

27.    HUMBL is a mobile financial services company based in San Diego.

28.    In its three-year history, HUMBL has launched numerous "core" products and services. On May 19, 2019, at its inception, the Company claimed to be developing the HUMBL Mobile Application ("Mobile App") "that allows customers to migrate to digital forms of payment, along with services such as maps, ratings, reviews."[7] The Company marketed the Mobile App together with an interconnected merchant software called HUMBL Hubs, which "enables

---

[6] Press Release, SEC, *SEC Charges Audit Firm BF Borgers and Its Owner with Massive Fraud Affecting More Than 1,500 SEC Filings*, https://www.sec.gov/newsroom/press-releases/2024-51 (May 3, 2024)

[7] HUMBL, Inc., SEC Annual Report, at 12 (Apr. 14, 2021), https://sec.report/otc/financial-report/278615 ("Annual Report").

merchants to accept major credit cards such as Visa, Mastercard and American Express via its contactless 'Point and Pay' solutions, as well as text orders, mobile payments, tipping, local deals, ratings and reviews."[8] The Company referred to the Mobile App and HUMBL Hubs as its first product vertical: HUMBL Pay.

29.     On December 17, 2020, the Company launched a second product vertical: HUMBL Marketplace (formerly known as HUMBL Studios), an online global marketplace for clothes and accessories. According to the Company, the HUMBL Marketplace "provides merchants with the ability to list and sell goods with greater levels of authentication, by using technologies such as the HUMBL Token Engine and HUMBL Origin Assurance, to improve the merchant ability to trade, track and pay for assets."[9]

30.     On January 25, 2021, the Company launched HUMBL Financial, which "has developed index, active and thematic investment products called Exchange Traded Index (ETX) products that allow customers to invest in baskets of assets on the blockchain. These products are non-custodial, algorithmically driven software services that allow customers to purchase and hold digital assets in pre-set allocations through their own digital asset exchange accounts." *Id.*

31.     On February 26, 2021, HUMBL announced its pivot to an event ticketing platform with a $20 million cash and stock acquisition of Tickeri. Officially launched on September 16, 2021, HUMBL Tickets purportedly "provide[s] consumers with direct access to lower-cost, premium seating options across verticals such as pro sports, college sports, concerts, theater, festivals, and more."

32.     On May 24, 2021, HUMBL conducted a limited initial launch of the HUMBL Non-Fungible Token ("NFT") Gallery to "allow content creators to create NFTs and consumers to

---

[8] Press Release, GlobeNewswire, *HUMBL Mobile App and HUMBL Hub Merchant Solutions Deliver Successful Pilot Transactions Between United States and Mexico* (Dec. 1, 2020), https://www.globenewswire.com/en/news-release/2020/12/01/2137564/0/en/HUMBL-Mobile-App-and-HUMBL-Hubs-Merchant-Solutions-Deliver-Successful-Pilot-Transactions-Between-United-States-and-Mexico.html (last visited Sept. 21, 2022) ("12.1.20 Press Release").
[9] Annual Report, at 12.

purchase them."[10] Over three months later, the Company conducted a re-launch with "over 15 original collections."[11] The HUMBL NFT Gallery is meant "for the creation, listing, sale, and purchase of Non-Fungible Tokens (NFTs) on the blockchain." *Id.*

33.    On November 8, 2021, HUMBL launched a second mobile application called the HUMBL Pay Mobile Wallet ("HUMBL Wallet"). The Company's press release about the launch stated: "HUMBL Pay users can: [1] Buy digital assets via major credit cards inside the HUMBL Pay mobile wallet, [2] Send digital assets such as BTC, ETH and USDC between HUMBL mobile wallets, [3] Perform gasless digital asset transactions between HUMBL mobile wallets, [and 4] Earn as much as 7% interest on various digital assets."[12]

34.    In sum, HUMBL—which has compared itself to technology giants like Apple and Amazon[13]—claimed to have "developed a full technology stack of blockchain solutions across a number of different verticals[,]" including "a mobile wallet, NFT and ticketing, in which customers can buy crypto, use and send up to 20+ digital assets" and "customized blockchain-as-a-service programs, such as mobile IDs and verifiable credentials, for government and private sector customers."[14]

---

[10] Press Release, GlobeNewswire, *HUMBL Announces Successful Launch of NFT Gallery* (May 24, 2021), https://www.globenewswire.com/news-release/2021/05/24/2234879/0/en/HUMBL-Announces-Successful-Launch-of-NFT-Gallery.html (last visited Sept. 21, 2022) ("5.24.21 Press Release").

[11] Press Release, GlobeNewswire, *HUMBL Announces Launch of HUMBL NFT Gallery and Client Services* (Sept. 7, 2021), https://www.globenewswire.com/news-release/2021/09/08/2293004/0/en/HUMBL-Announces-Launch-of-HUMBL-NFT-Gallery-and-Client-Services.html (last visited Sept. 21, 2022) ("9.7.21 Press Release").

[12] Press Release, GlobeNewswire, *HUMBL Announces Launch of HUMBL Pay Mobile Wallet with Peer-to-Peer (P2P) Functionalities* (Nov. 23, 2021), https://www.globenewswire.com/en/news-release/2021/11/23/2339929/0/en/HUMBL-Announces-Launch-of-HUMBL-Pay-Mobile-Wallet-with-Peer-to-Peer-P2P-Functionalities.html (last visited Sept. 21, 2022) ("11.23.21 Press Release").

[13] HUMBL, Inc., "Company Roadmap" PowerPoint Presentation, https://global-uploads.webflow.com/5f29edcccc8a2a029f37475a/603d9ced2452d5fdbb2bd112_HUMBL%20Company%20Roadmap%202021%20PDF.pdf.

[14] Press Release, Newsfile Corp., *HUMBL, Inc. to Present at Investor Summit Group's Q2 In-Person Conference* (Apr. 27, 2022), https://www.newsfilecorp.com/release/121910/HUMBL-Inc.-to-Present-at-Investor-Summit-Groups-Q2-InPerson-Conference (last visited Sept. 21, 2022).

35.     Defendants' statements about these products and services resulted in HUMBL's market capitalization peaking at over $50 billion on a fully diluted basis.

36.     But the Company's promises of its products and services disrupting their industries were a sham. To date, HUMBL has not developed any monetizable proprietary products. Instead, Defendants have spent resources on marketing a purportedly global platform of products and services that simply did not exist at the time they were announced. Defendants' false and/or misleading statements garnered massive investor interest and artificially boosted the Company's stock price, which the Individual Defendants took advantage of and financially benefited from before the truth became known and caused that inflation to dissipate. Defendants' multifaceted scheme has left shareholders holding an empty bag.

37.     During the Class Period, the Company's true business model was to (1) pump up HUMBL share price by (a) launching a new "disruptive" product, (b) announcing a new partnership to purportedly aid in the product's immediate effectiveness in the market, (c) flooding the public with flashy press events, advertisements, social media posts, and misleading press releases to persuade investors to buy and hold shares, while (d) failing to follow through on partnerships or invest the funds needed to make the product a success, and then (2) pivot to another sector where HMBL repeated the pump-and-pivot cycle while Company insiders used clandestine corporate actions, toxic debt, and related parties to make hundreds of millions of dollars.

**B.     The Scheme is Set in Motion**

38.     The merger between Tesoro and HUMBL was facilitated by Defendant Sharp – a known player in the OTCMKT with a history of brokering reverse mergers and a penchant for thoroughbred horses (including one named "Front-Run the Fed"[15]).

---

[15] "Front running is the illegal practice of purchasing a security based on advance non-public information regarding an expected large transaction that will affect the price of a security. Front running is considered as a form of market manipulation and insider trading because a person who commits a front running activity expects security's price movements based on the non-public information." https://corporatefinanceinstitute.com/resources/knowledge/trading-investing/front-running/. Cases of front running typically involve trading stock in and out of undisclosed,

39.    In this instance, Sharp connected Defendant Foote with Tesoro's near-death CEO Henry Boucher ("Boucher") and orchestrated a lightening-speed merger that instantly turned a worthless company into one worth billions of dollars—despite having no products on the market.

40.    On November 4, 2020, Foote and Boucher entered into a Stock Purchase Agreement, whereby Foote assigned to Boucher a $40,000 promissory note issued by HUMBL LLC, which, upon consummation of the merger, HUMBL would exchange for a convertible debenture bearing interest at 8% per annum, due on December 31, 2021, and convertible into HUMBL common stock at $0.005 per share. In exchange for the note, Boucher transferred 7 million Series A Preferred shares and 550,000,000 common shares to Foote, in his individual capacity, and immediately resigned as CEO of Tesoro.

41.    On November 12, 2020, Tesoro announced that it entered into an agreement to merge with HUMBL in an all-stock transaction whereby members of HUMBL received preferred shares of Tesoro in exchange for their HUMBL holdings. The Company did not disclose the number of preferred shares to be issued.

42.    The Company simultaneously announced that Foote was installed as President, Hinshaw as Secretary, Michelle Rivera as a director and Vice President, Global Partnerships, and Karen Garcia as Vice President, Major Accounts.[16] Sharp remained on as an advisor to HUMBL, while also working with HUMBL in his capacity as President of Forwardly.[17]

43.    Pursuant to the Plan of Merger, "all of the Interests of the LLC shall be exchanged for the Merger Consideration"—*i.e.*, 552,029 shares of Series B Preferred Stock of the C Corp for the interests of the Members of the LLC—"and all references to the C Corp common stock reflect

---

unmonitored accounts of relatives or confederates. *See, e.g.*, https://www.sec.gov/news/press-release/2013-2013-93htm.

[16] Plan of merger, https://contracts.justia.com/companies/humbl-inc-14351/contract/246466/ at 3.

[17] Press Release, GlobeNewswire, *Forwardly, Inc. Acquires Warrants to Purchase 500 Million Shares of Tesoro Enterprises, Inc.* (Dec. 10, 2022), https://www.globenewswire.com/en/news-release/2020/12/10/2143178/0/en/Forwardly-Inc-Acquires-Warrants-to-Purchase-500-Million-Shares-of-Tesoro-Enterprises-Inc.html (last visited Sept. 21, 2022) ("12.10.22 Press Release").

a planned 1:4 reverse split."[18] Five months later, in April of 2021, HUMBL finally disclosed in its Annual Report that each of those Series B shares would be convertible to 10,000 common shares.

44.    Completion of the merger was conditioned, in part, on LLC Member Approval of the Plan of Merger and the Merger.[19] Thus, as members of the LLC each of the Individual Defendants knew about the planned reverse split, as well as the Series B conversion rate, by at least November 4, 2020.

45.    The Individual Defendants knew that the share structure put into place by the merger agreement would massively dilute shareholder holdings; however, Defendants did not disclose these impending and pre-planned corporate actions.

46.    Instead, before markets opened on Friday, November 13, 2020, Hinshaw announced that "the company [was] retiring 551,669,335 million common shares that Tesoro President, Brian Foote, agreed to surrender without consideration." By the time markets closed that day, the news of Foote's surrender had caused the Company's share price to spike 91% from the prior day – $0.0188 up to $0.036. On Monday, November 16, 2020, the Company's shares spiked another 250% – reaching $0.126.

47.    Before markets opened on November 17, 2020, HUMBL announced in a press release that Foote had "agreed to convert over 318 million shares recently purchased by him out of the retail market to a new class of Preferred shares."[20] HUMBL claimed those 318 million shares represented "over $10 million worth of stock" that Foote "purchased directly out of the market."

48.    On November 23, 2020, Forwardly, LLC—controlled by Sharp—invested an undisclosed amount in Tesoro in exchange for warrants to purchase 500 million common shares within two years of the HUMBL/Tesoro merger. In a December 10, 2020 press release issued by

---

[18] Plan of merger at 3 and 4.
[19] Plan of merger at 11.
[20] Press Release, GlobeNewswire, *Tesoro Enterprises, Inc. CEO to Lock Up Over $10 Million Worth of Stock Purchases Directly Out of Market* (Nov. 17, 2020), https://www.globenewswire.com/news-release/2020/11/17/2128395/0/en/Tesoro-Enterprises-Inc-CEO-to-Lock-Up-Over-10-Million-Worth-of-Stock-Purchased-Directly-Out-of-the-Market.html (last visited Sept. 21, 2022) ("11.17.20 Press Release").

Forwardly, Sharp stated that the investment in HUMBL was immediately beneficial due, in part, to "the fortuitous timing of the execution of the purchase agreement."[21]

49.    On December 9, 2020, Tesoro announced its merger with HUMBL was complete.

50.    Once the merger was complete, Defendants focused on marketing, rather than development, maintaining investor interest rather than supporting HUMBL's business. And thus, the ultimate goal of Defendants' scheme was to maintain the public's interest by launching products, creating a façade of legitimacy through stock restrictions, while diluting shareholder value (and enriching Company insiders and/or related parties) through toxic debt.

**C.    HUMBL Launches, but Fails to Develop, Product after Product.**

**1.    HUMBL Pay**

51.    Initially, HUMBL was a mobile financial services company with a "product lineup [that] include[d] the HUMBL Mobile App, HUMBL Mobile Pay, HUMBL POS Tablets and HUMBL Hubs® agent locations delivering mobile financial services for customers, merchants and agents."[22]

52.    On December 1, 2020, the Company detailed the HUMBL Pay products in a press release just after announcing the impending merger:

> The HUMBL® Mobile App delivers borderless transactions, by integrating multiple currencies, payment methods, banks, blockchain and financial services providers into one-click for the customer. HUMBL® provides greater access and portability than US only mobile wallet providers, such as Venmo® and Zelle® and will offer a HUMBL Hubs™ merchant software for clients without smartphones in certain domiciles.
>
> * * *
>
> HUMBL Hubs™ enables merchants to accept major credit cards such as Visa, Mastercard and American Express via its contactless "Point and Pay" solutions, as well as text orders, mobile payments, tipping, local deals, ratings and reviews.[23]

---

[21] 12.10.22 Press Release.

[22] Press Release, PRNewswire, *HUMBL Partners With Digital India Payments (DIPL) TO Enter India Market* (Mar. 20, 2022), https://www.prnewswire.com/news-releases/humbl-partners-with-digital-india-payments-dipl-to-enter-india-market-301027587.html (last visited Sept. 21, 2022) ("3.20.22 Press Release").

[23] 12.1.20 Press Release.

53.     On December 9, 2020, during the Company's first investor call after going public, Foote used the following PowerPoint slide to list the Mobile App's functions, and added that "**right now**, in the barn, we have – send money, request money, receive money, exchange money, stable coins":[24]



54.     On April 16, 2021, HUMBL announced its launch of the first version of the HUMBL Pay mobile application later that day, stating that the app will "allow customers to discover merchants; as well as pay, tip, rate and review those same merchants in contactless transactions." The press release further noted that the company "has also integrated ticketing" into the Pay App, to allow customers "to find and purchase tickets to live events" while highlighting the phased rollout beginning in the United States and thereafter being launched in several countries throughout the world.[25]

*a.   Partnerships Purportedly Supporting HUMBL Pay*

55.     Leading up to the completion of the merger, on March 20, 2020, HUMBL issued a press release entitled "HUMBL Partners With Digital India Payments (DIPL) To Enter India Market" announcing a deal with DIPL, a company that processes payments for 30,000 merchants

---

[24] Investor Call, at 00:25:24 (Dec. 9, 2020), https://support.humbl.com/investors/investor-call ("12.9.20 Investor Call").

[25] Press Release, GlobeNewswire, *HUMBL Announces Launch of HUMBL Pay Mobile Application* (Apr. 16, 2021), https://www.globenewswire.com/en/news-release/2021/04/16/2211835/0/en/HUMBL-Announces-Launch-of-HUMBL-Pay-Mobile-Application.html (last visited Sept. 21, 2022) ("4.16.21 Press Release").

in India, Nepal, Bangladesh, Maldives, Myanmar, and Sri Lanka.[26] In the press release, Defendant Foote was quoted as saying "We look forward to putting HUMBL technologies to work for 1.4 billion India customers" and the Company noted that it would offer "walk-in services to customers, such as cash pickup, foreign exchange, fair lending, bill payments, pre-paid cards, store credits, travel bookings, internet and cell phone minutes from local merchant ('agent') locations."

56.    On April 3, 2020, HUMBL issued a press release entitled "HUMBL and One Kiosk Team Up On Africa Home Delivery Network" announcing a deal with Nigerian-based One Kiosk, a company that brings together merchants and online delivery services.[27] One Kiosk's CEO stated at the time that his company had seen a boom in online ordering due to the COVID-19 pandemic and he believed the ability to pair his company's service with HUMBL's financial services would be a "powerful economic driver." Defendant Foote stated that HUMBL would use its platform to help local small businesses compete with larger companies, noting that "HUMBL helps them get in the game against big box competitors."

57.    Then, on November 24, 2020, HUMBL announced a "strategic investment" from Cyberbeat—"a leading digital payments and financial technologies company led by veteran digital payment industry executives of the Asia Pacific region[.]"[28] HUMBL claimed that "[t]he strategic partnership enables HUMBL to explore sales and installation expansions through Cyberbeat into operating markets such as Singapore, Myanmar, Nepal, India, Vietnam and the Pacific Islands, reflecting over a 1.5 billion consumer and merchant opportunity." *Id.* Cyberbeat CEO, Rajan S. Narayan is quoted as saying: "We have seen a number of technology cycles over the decades at Cyberbeat. The national migrations to digital forms of ID's, money, payments and financial

---

[26] 3.20.22 Press Release.
[27] Press Release, PRNewswire, *HUMBL Kiosk Team Up On Africa Home Delivery Network* (Apr. 3, 2020), https://www.prnewswire.com/news-releases/humbl-and-one-kiosk-team-up-on-africa-home-delivery-network-301035242.html (last visited Sept. 21, 2022).
[28] Press Release, Globe Newswire, *HUMBL Partners with Cyberbeat to Expand into Asia Pacific and Pan-India Vertical* (Nov. 24, 2020), https://www.globenewswire.com/en/news-release/2020/11/24/2132871/0/en/HUMBL-Partners-with-Cyberbeat-to-Expand-into-Asia-Pacific-and-Pan-India-Vertical-Markets.html (last visited Sept. 21, 2022) ("11.24.20 Press Release").

services products is the most exciting one yet, and we believe the HUMBL brand will achieve mass penetration in this region, given its flexible technology solutions and architecture[.]" *Id.*

58.    In response to this Cyberbeat news, HUMBL's share price rose dramatically:

| Date | HUMBL Open | HUMBL Close | Percentage Δ |
|------|-----------|-------------|--------------|
| November 24, 2020 | $0.086 | $0.128 | +58.91% |
| November 25, 2020 | $0.1316 | $0.165 | +28.66% |
| November 26, 2020 | $0.212 | $0.432 | +161.74% |
| November 27, 2020 | $0.7564 | $0.798 | +84.55% |

59.    In a letter to shareholders on January 22, 2021, HUMBL declared that it had secured its "'first of multiple option payments on the distribution rights deal in [the] Oceania region' with plans to enter the region with this group[.]"[29] Foote was vague about the details at the time, but according to the Company's Annual Report, Foote's announcement related to Tuigamala Group Pty Ltd ("TGP")—an Australian entity who paid $600,000 in December of 2021 for an option to purchase the territory rights with plans to invest an aggregate $15 million.[30] The initial $600,000 payment also granted TGP 12.5 million warrants at $1 each, which was worth as much as $84 million at HUMBL's peak Class Period price.

60.    HUMBL also announced that it had "secured" a "binding term sheet for a joint venture on our first HUMBL HUBS beta test location in the United States, which will serve as a concept for testing our brand strategy, services and technologies."[31]

61.    In response to the TGP deal and announcement of a binding term sheet, the Company's share price rose:

| Date | HUMBL Open | HUMBL Close | Percentage Δ |
|------|-----------|-------------|--------------|
| January 21, 2021 | $1.307 | $1.24 | +5.12% |
| January 22, 2021 | $1.387 | $1.413 | +13.94% |
| January 23, 2021 | $1.652 | $1.916 | +35.59% |

*b.    Publicity Supporting HUMBL Pay*

---

[29] Letter to Shareholders (Jan. 22, 2021), https://global-uploads.webflow.com/5f29edcccc8a2a029f37475a/600b6060eba146336b6b6d53_HUMBL%20Shareholder%20Letter%20PDF.pdf, ("1.22.21 Shareholder Letter")
[30] Annual Report, at 33.
[31] 1.2.21 Shareholder Letter.

62.    On December 1, 2020, the Company announced that HUMBL had "delivered its first live transactions in the Mexico market" and that "[t]he event was recorded during the production of a HUMBL brand video" titled "A Borderless Day in Baja," (the "Baja Video") to premier during HUMBL's first investor call on December 9, 2020.[32]

63.    HUMBL described the events that unfolded in the video, which it posted to its website on December 9, 2020, as:

> [B]eta testers are seen transacting within the HUMBL® mobile wallet to digitally send, receive and exchange currencies across the border; as well as paying, tipping and transacting with merchants.
>
> In addition, HUMBL® showcases financial technologies such as USD Stablecoins, which enable Latin American customers to avoid domestic currency fluctuations, by holding their money in US dollars on the blockchain in the HUMBL® mobile wallet.
>
> The company also demonstrated its HUMBL Hubs™ Point of Sale (POS) solutions for merchants in Mexico, designed to assist millions of "Cash Only" Latin American merchants with a seamless migration to the digital economy.[33]

64.    On April 16, 2021, the day the HUMBL Mobile App launched, Nick Carter ("Carter")—a member of the 1990s hit boyband, The Backstreet Boys—posted a picture of his HUMBL Pay username and headshot for his 675,000 Twitter followers.

65.    In addition to that celebrity attention, the HUMBL Mobile App immediately received an influx of five-star rave reviews in the Apple Application Store ("App Store"), where the HUMBL Pay App was available for download.

66.    On April 17, 2021, one reviewer wrote:

---

[32] 12.1.20 Press Release.
[33] HUMBL, Inc., FACEBOOK (Dec. 9, 2020), https://www.facebook.com/HUMBLinc/videos/introducing-humbl/298637161498600/.



★★★★★

Deleted Robinhood, 04/17/2021

**User-friendly, Crypto, NFTs, better than PayPal**
Deleting PayPal, Venmo, Etsy, and rolling with HUMBL. It does all of the stuff "those other apps" do, plus allows me to invest in crypto and create and merchandise NFTs. This app is my one-stop shop for gaining a stronger financial position. I haven't used the credit or loan features yet, but nice to know they're there- housed in an app I can trust.

67.     On April 18, 2021, another reviewer wrote:



★★★★★

Moneyfits, 04/18/2021

**Best pay app option out there**
I can send money back and forth between family and friends as well as pay merchants who are adopting this new app as they charge less fees than the others. The growing list of option for this new and exciting company will be awesome. Investing in Crypto ETXs and the ability to convert currencies is unparalleled. Love this company.

68.     None of the reviewers disclosed a connection to HUMBL.

69.     Carter also continued to use his platform to promote HUMBL's Mobile App. On November 24, 2021, Carter tweeted: "Excited to be able to send and receive digital assets this holiday season with @HUMBLPAY!! #HUMBL #Sponsored" above a HUMBL infographic:



c.     *The Truth About HUMBL Pay*

70.     The HUMBL Pay products' true functionality, geographic reach, and user satisfaction stood in stark contrast to the Company's public statements and promotional conduct.

71.     With respect to functionality, the HUMBL Mobile App's basic features—which,

18

Foote described as "send money, request money, receive money, exchange money, stable coins"—failed to work as promised. As a result of its investigation and testing of the HUMBL Mobile App, Hindenburg Research ("Hindenburg") discovered that:

> there is no way to send, receive, or request money between users or to even know which users are on the platform... [W]e found it didn't recognize individual users – not even Nick Carter. Furthermore, [sic] there is no indication that users can do anything with stablecoins. All told, the consumer features that Foote claimed to be functional 4 months earlier [during the 12.9.20 Investor Call] don't seem to work.[34]

72.    Hilo Negro winery and wine bar—also featured in the Baja Video—told Hindenburg that it "only use[s] Visa, Mastercard, Carnet (a Mexican transaction service) and also Samsung Pay... No, no we don't use that one (HUMBL)." *Id.*

73.    Fernando Cuevas, the tour operator featured in the Baja Video and HUMBL's "lead affiliate sales representative in the region," told Hindenburg that the "app isn't ready" and that "until modifications are made to the app, no merchants in Mexico will be able to use it." *Id.*

74.    In addition, there is no evidence that HUMBL Hubs have been used by any merchants, which also appeared to be successfully demonstrated in the Baja Video.

75.    Though the Baja Video momentarily flashes a page of text that states the video includes "live and simulated transactions," none of the merchants featured in the video indicated to Hindenburg that they demonstrated a live transaction.

76.    In addition to misleading investors about the capabilities of the HUMBL Pay products, the Company's announcements of strategic partnerships were either doomed from the start or not followed through by the Company.

77.    First, Hindenburg spoke with Nayan Raut ("Raut"), the consultant for DIPL in its negotiations with HUMBL. While noting that DIPL's agent network had largely shut down due to the COVID-19 pandemic, Raut stated that "there were longer term issues, explaining that government regulations in India do not allow a payment platform to charge merchants or

---

[34] *HUMBL: Illusions of Grandeur, Collapsing International Deals, And Lurking Dilution* (May 20, 2021), https://hindenburgresearch.com/humbl/ ("Hindenburg Report").

consumers any percentage, hampering HUMBL's planned business model." *Id*. HUMBL never updated shareholders when it became clear that the DIPL partnership was not moving forward.

78.     Similarly, HUMBL's purported partnership with One Kiosk in Africa was non-existent. One Kiosk's CTO Olatunbosun Babatunde ("Babatunde") told Hindenburg: "HUMBL actually reach[ed] out to us and they wanted One Kiosk to use their payment system on our platform as a way of entering the African market. But it never went beyond that." *Id*.

79.     In a separate signed statement, Babatunde stated:

> HUMBL took advantage of One Kiosk's desire for accelerated growth during the COVID-19 pandemic by entering into an agreement with us but obviously either had no intention or no capability to perform. The plan was for HUMBL technologies to be deployed in One Kiosk's retail outlets stores to promote the adoption of contactless delivery and pay services in Africa, beginning in Nigeria. However, beyond the press release on April 3 2020 of our intent 'HUMBL® and One Kiosk® Team Up On Africa Home Delivery Network,' HUMBL made no effort to commence the proposed business relationship.

80.     With respect to TPG, given the magnitude of the investment (an aggregate amount of $15 million), investors were led to believe that TPG had a significant foothold in the Oceania region that would immediately aid in the expansion of HUMBL Pay products. But there is no physical or online evidence of TPG's existence. Instead, a filing with the Australian Securities and Investments Commission shows that TPG was formed just one year earlier, on September 16, 2019, and that its principal place of business was the modest personal residence of the owner, Julius Elisara Tuigamala.

81.     In the Annual Report, HUMBL announced that negotiations between it and TPG had terminated and TPG did not invest anymore into HUMBL beyond the initial $600,000. Nevertheless, TPG kept the 12.5 million warrants—which, at one point, were worth $84 million.

82.     HUMBL's Cyberbeat partnership was another sham. Rather than partnering with a "proven winner" with "decades" of experience, Cyberbeat was a two-year old start-up company with only two employees. HUMBL has offered no specifics about the Cyberbeat partnership after the initial press release, and there is no evidence that HUMBL and Cyberbeat have engaged in any

business. Nevertheless, Cyberbeat's two employees received preferred shares convertible into 15,930,000 common shares—valued at $14 million at one point.

83.    In sum, the partnerships with DIPL, One Kiosk, TPG, and Cyberbeat either never existed or were wildly, purposefully overstated. Indeed, there is no evidence that suggests these partnerships evolved past the press release stage. HUMBL has never updated its shareholders about the status of these deals, leaving them to improperly believe that no news is good news.

84.    Considering its lack of real functionality and international partnerships, the indications of user satisfaction with the HUMBL Mobile App are unrealistically high. HUMBL's reviews appear to be disingenuous and/or purchased without disclosing that the advertisements were paid promotions.

85.    For example, Nick Carter's first post about HUMBL, posted the day that the Mobile App launched, did not indicate that his tweet was sponsored. But it was. Indeed, on June 29, 2021, HUMBL issued Carter 1 million common shares, valued at $1.02 per share at issuance.[35] About seven months later, Carter began including "#sponsored" in his HUMBL tweets to indicate that the Company was compensating him. But at the critical moment of launch—while HUMBL was pumping up the price of its shares—Carter's glowing endorsement of the HUMBL Mobile App appeared unprompted by anything other than his satisfaction with the product.

86.    HUMBL's Apple App Store reviews also appear to be disingenuous. One would expect that users, popularity, and reviews would increase over time for a mobile app that could lead a person to delete mega-apps like PayPal, Venmo, and Etsy all at once—but the opposite was true for HUMBL. The app had a few days of rave reviews followed by a complete collapse, trickling off to zero new reviews less than 2 weeks after launch.[36]

---

[35]  HUMBL, Inc., SEC Amended OTC Quarterly Report, at 12 (June 30, 2021, https://sec.report/otc/financial-report/296634 ("6.30.21 Quarterly Report").
[36]  Apple App store: https://apps.apple.com/us/app/humbl-pay/id1548843501#see-all/reviews.



87.     In sum, while shareholders were led to believe that the Company had successfully launched a five-star HUMBL Mobile App and secured critical partnerships with vast geographic reach and an immediate ability to launch HUMBL Pay products around the world, what shareholders really received were publicity stunts that cost the Company's shareholders nearly $100 million.

88.     While HUMBL Pay was the Company's flagship vertical at the outset, its financials indicate that it has invested very little money in the Mobile App or HUMBL Hubs prior to pivoting to new products.

89.     In 2020, the Company's development costs were a measly $21,228, while the remaining operating expenses—which include advertising and marketing costs—were over three times more.[37] Likewise, in 2021, development costs were $102,303, while operating costs totaled over $1.4 million. *Id.*

2. HUMBL Marketplace

90.     In its first iteration, HUMBL Marketplace was called HUMBL Studios and was an online marketplace for clothes and accessories from various artisans, which also featured HUMBL-branded merchandise like hats and t-shirts.

91.     During the first conference call with investors on December 9, 2020, Foote promoted HUMBL Marketplace, saying: "before you buy online come on by HUMBL and make

---

[37] HUMBL, Inc., SEC Quarterly Report, at 22 (May 17, 2021), https://sec.report/otc/financial-report/283462 ("5.17.21 Quarterly Report").

sure you're getting the best deal. We'll aggregate some links and some merchant codes and some things like that to make sure that we can get customers great deals. We'll be curating some channels there. We've engaged with some local artisans as well."[38]

92.     By March 31, 2021, the Company said: "HUMBL provides merchants with the ability to list and sell goods with greater levels of authentication, by using technologies such as the HUMBL Token Engine and HUMBL Origin Assurance, to improve the merchant ability to trade, track and pay for assets."

93.     Hindenburg investigated the functionality and user satisfaction of the HUMBL Marketplace by calling several merchants. When Hindenburg spoke with Jake Hubenak at The Meat Project, Hubenak "told [Hindenburg] that HUMBL had approached him about putting his barbeque seasoning business on the platform because someone at HUMBL used and liked the products" and that "'not a day goes by' when he doesn't get an order through HUMBL."[39]

94.     It was a glowing endorsement. But, when we asked if he got paid to promote HUMBL, Hubenak told Hindenburg that "he couldn't talk about that because of a confidentiality agreement." *Id*.

95.     HUMBL has not disclosed if it pays merchants to endorse its platform.

96.     The Hindenburg Report also confirmed that "few merchants in the U.S. described as accepting payments – either through HUMBL Pay or HUMBL Marketplace – could actually receive payments."

97.     And, even if merchants could receive payments, the acceptance of such payments would not disrupt the global payments space, much less cause a major disruption as HUMBL touted. Indeed, HUMBL has not developed any new global payment functionality; it relies on its competitor, Stripe—one of the largest online payment processors in the world—to transact the business HUMBL Marketplace claims to facilitate.

---

[38] 12.9.20 Investor Call, at 00:23:30.
[39] Hindenburg Report.

### 3.    HUMBL Financial

98.    HUMBL's third product line is HUMBL Financial. On February 2, 2021, HUMBL launched BLOCK EXTs—"created by HUMBL Financial"—in over 100 countries. Though HUMBL Financial did not create BLOCK ETX, Defendants knew the ETXs constituted securities.

99.    While focusing HUMBL on mobile financial services, the Individual Defendants simultaneously worked on a second venture: BLOCK 30 Labs, LLC ("BLOCK 30"). Unlike HUMBL, BLOCK 30 was involved in the blockchain and cryptocurrency space.

100.    For example, on November 16, 2018, BLOCK 30, helmed by Foote and Hinshaw, announced the "global release of its BLOCK 30 index for the digital trading ('Crypto') markets. The BLOCK 30 Index is one of the first US indexes to help investors track multiple factors beyond bitcoin, including: Market Cap, Asset Price, Trading Volume, Sector Weighting, Market Sentiment and an Index Committee."[40]

101.    BLOCK 30 purported to include "a network of global blockchain technologists, computer scientists, economists, financial engineers, researchers and global media alumni from Yale, Harvard, Georgetown, Wharton, Duke, Stanford, UCSB and UCLA – working to improve the quality of coverage around blockchain and the digital trading markets." *Id.*

102.    On April 9, 2019, BLOCK 30 Financial (a wholly owned subsidiary of BLOCK 30) announced its global strategic partnership with Blackmoon Financial Group to launch its BLOCK 30 Index ETX "that tracks thirty of the top digital assets in one digital asset basket for global investors."[41]

---

[40] Press Release, PRNewswire, *NEW BLOCK 30 index Launches For Crypto Trading Markets* (Nov. 16, 2018), https://www.prnewswire.com/news-releases/new-block-30-index-launches-for-crypto-trading-markets-300752209.html (last visited Sept. 21, 2022) ("11.16.18 Press Release").

[41] Press Release, PRNewswire, *Blackmoon and BLOCK 30 Labs Form Global Strategic Partnership to Launch BLOCK 30 Exchange Traded Index (ETX)* (Apr. 9, 2019), https://www.prnewswire.com/news-releases/blackmoon-and-block-30-labs-form-global-strategic-partnership-to-launch-block-30-exchange-traded-index-etx-300827876.html (last visited Sept. 21, 2022) ("4.9.19 Press Release").

103.    A year later, on April 13, 2020, Blackmoon Financial shuttered its doors following the issuance of a preliminary injunction by the United States District Court for the Southern District of New York based on its finding that the SEC had demonstrated a plausible case for characterizing cryptocurrency tokens as securities.

104.    In order to distance itself from Blackmoon Financial—and the knowledge that a cryptocurrency platform compliant with all modern regulations was not competitive with unregulated alternatives that are available in the market[42]—the Individual Defendants unofficially rebranded BLOCK 30 as HUMBL Financial.

105.    On January 13, 2021, the BLOCK 30 twitter account announced that "BLOCK 30 Labs is officially closing for business. Thank you to the people around the world that welcomed us on the journey so far."[43]

106.    Simultaneously, or shortly thereafter, a new page titled "Financial" was added to the menu on HUMBL's website which had a drop-down menu that included pages titled Research, Buy/Sell, Portfolio, and Tutorials.

107.    Social media and other online forums that are disproportionately popular with investors who engage in blockchain-related companies were immediately ablaze. For example, on January 15, 2021, one HUMBL shareholder posted a 7-minute-25-second video titled: "BLOCK 30 LABS Closing Why This is Exciting News for HUMBL $TSNP $HMBL." In the video, which has been viewed over 4,000 times, the shareholder shared a screenshot of the new HUMBL menu and broke down the significance of the BLOCK 30/HUMBL connection:

> We got some information yesterday about BLOCK 30 closing the doors, so we all know, if you don't know already, Brian Foote, the owner of BLOCK 30 is also the owner of HUMBL ... The fact of the matter is BLOCK 30 is the foundation ... BLOCK 30 also has a lot of partnerships around the world with different companies and organizations ... If they merge BLOCK 30 into HUMBL, they're already gonna

---

[42] Aziz Abdel-Qader, *Blackmoon Crypto Shuts Down Citing Little Hopes for Gram Release*, April 13, 2020, https://www.financemagnates.com/cryptocurrency/exchange/blackmoon-crypto-shuts-down-citing-little-hopes-for-gram-release/

[43] Block 30 (@Block30Labs), TWITTER (Jan. 13, 2021, 2:43 PM), https://twitter.com/block30labs/status/1349441999657598976.

bring all these assets you might say all these connections they've already made with BLOCK 30 into HUMBL which is going to make HUMBL profitable right from the beginning.[44]

108.    As a result, by Monday, January 19, 2021, HUMBL's share price had increased 43.14%, from $0.928 to $1.168.

109.    On January 22, 2021, HUMBL published a Shareholder Letter announcing that it had entered into a binding term sheet with three affiliated entities – BLOCK 30 Financial, BLOCK 30 Marketplace and BLOCK 30 Pay – "to purchase all of their patents, trademarks, software and other intellectual property in exchange for HUMBL common stock."[45]

110.    Then, before markets opened on January 25, 2021, HUMBL announced the launch of HUMBL Financial: "The HUMBL Financial division will launch first from its Singapore offices to a number of countries, by providing blockchain indexes, proprietary trading algorithms and financial services for the new digital asset trading markets. The first services offered by HUMBL Financial will be the BLOCK Indexes and the BLOCK Exchange Traded Indexes (ETXs)[,]" which "comprise over 17,250 lines of proprietary code and are architected across index, active and thematic strategies."[46]

111.    By the time the market closed on January 25, 2021, HUMBL's share price had jumped 35.59%, from $1.652 to $1.9156.

112.    On February 2, 2021, before markets opened, HUMBL announced its successful launch of "its BLOCK Exchange Traded Index (ETXs) lineup in over one hundred countries across North America, Latin America, Asia, Middle East, Africa and the Caribbean."[47] HUMBL's press

---

[44] *BLOCK 30 LABS CLOSING Why This is Exciting News for HUMBL $TSNP $HMBL*, YOUTUBE (Jan. 15, 2021), https://www.youtube.com/watch?v=ERT7xOXYzwU (last visited Sept. 21, 2022) (cleaned up).

[45] 1.22.21 Shareholder Letter.

[46] Press Release, GlobeNewswire, *HUMBL Announces Launch of HUMBL Financial Division* Jan. 25, 2021), https://www.globenewswire.com/en/news-release/2021/01/25/2163553/0/en/HUMBL-Announces-Launch-of-HUMBL-Financial-Division.html (last visited Sept. 21, 2022) ("1.25.21 Press Release").

[47] Press Release, GlobeNewswire, *HUMBL Financial Launches BLOCK ETX Products in Over 100 Countries* (Feb. 2, 2021), https://www.globenewswire.com/news-

release stated: "The BLOCK ETX lines were created by HUMBL Financial to give retail investors access to 'one-click' software services on the new digital asset trading markets. The BLOCK ETXs track three different vertical themes: Index, Active and Thematic strategies, allowing customers simplified portfolio exposure to new blockchain trading markets." *Id*.

113.    HUMBL's share price skyrocketed:

| Date | HUMBL Open | HUMBL Close | Percentage Δ |
|---|---|---|---|
| February 2, 2021 | $1.61 | $1.846 | **+16.81%** |
| February 3, 2021 | $1.936 | $2.66 | **+44.10%** |
| February 4, 2021 | $2.90 | $3.72 | **+39.85%** |
| February 5, 2021 | $4.48 | $5.52 | **+48.29%** |
| February 8, 2021 | $6.76 | **$6.84** | **+23.91%** |

114.    As all this was occurring with the HUMBL stock, Defendants were simultaneously launching the BLOCKs token, the so-called native cryptocurrency for the BLOCK ETX ecosystem.

115.    Just over a year later, on February 14, 2022, HUMBL suspended its BLOCK ETX subscription products, citing to dialogue with the SEC surrounding the Company's S-1 filing.

116.    In response to that news, HUMBL's share price dropped 6.86% and an additional 12.26% the following day.

117.    Defendants had manipulated the market's astronomical response to HUMBL's apparent acquisition of BLOCK 30, the partnerships and the technology, just as it had previously done with HUMBL Pay and HUMBL Marketplace—by announcing a partnership or acquisition, which pumped the stock price up, but then never following through on the deal.

118.    While HUMBL's financials show that BLOCK 30 received 249,707 Series B Preferred shares as a result of the merger between HUMBL and Tesoro, there is no evidence to suggest that HUMBL acquired BLOCK 30. Indeed, in HUMBL's Annual Report, when asked to "[l]ist any ... merger, acquisition, spin-off, or reorganization either currently anticipated or that

---

release/2021/02/02/2168261/0/en/HUMBL-Financial-Launches-BLOCK-ETX-Products-in-Over-100-Countries.html (last visited Sept. 22, 2022) ("2.2.21 Press Release").

occurred within the past 12 months[,]" it did not list BLOCK 30 or the other affiliated entities.[48]

119.    To the contrary, the evidence suggests that Foote spun the BLOCK 30 products into a different, private venture called Blocks, DAO LLC ("Blocks DAO"), which was founded in June of 2021 by Brian Foote.[49] In a November 3, 2021 tweet, Foote compared HUMBL and Blocks DAO, touting the strengths of each: "#HUMBL: Public company, focused on consumer packaging of blockchain / #BLOCKS: Autonomous, decentralized blockchain network out of Wyoming." Hinshaw had also become involved with Blocks DAO by June 2022.[50]

120.    In short, HUMBL shareholders paid BLOCK 30, *i.e.*, Foote and Hinshaw, Series B Preferred shares in return for, at best, a license to use BLOCK 30 products, while BLOCK 30 retained its rights to independently monetize its technology. After defraying the cost of development and regulatory fights to HUMBL shareholders, Foot and Hinshaw then monetized that technology through Blocks DAO.

### 4.    HUMBL Tickets

121.    Before markets opened on February 26, 2021—the day after announcing the 4-1 reverse stock split—HUMBL inflated its stock price with another acquisition, this time of "Tickeri, Inc. ('Tickeri') in a debt and stock transaction totaling $20,000,000 (USD). Tickeri is a leading ticketing, live events and box office SaaS platform featuring Latin events and artists throughout the United States, Latin America, and the Caribbean corridor."[51]

122.    HUMBL touted Tickeri's geographic reach as "one of the few ticketing companies to focus on the Latin market, with advanced features such as real time reporting, analytics, box

---

[48] Annual Report, at 2.

[49] Wyoming Secretary of State, Business Center https://wyobiz.wyo.gov/Business/FilingDetails.aspx?eFNum=03210200012522400015003413910921917320311806114 (last visited Sept. 22, 2022) (listing Foote as the Organizer on the Business Filing). Foote is also listed as a Member in the Articles of Incorporation, and Manager and a Member in the Amended and Restated Articles of Incorporation of BLOCKS DAO.

[50] *See* Limited Liability Company Annual Report of BLOCKS DAO signed by Hinshaw.

[51] Press Release, GlobeNewswire, *HUMBL, Inc. Announces Binding Term Sheet to Acquire Tickeri, Inc.*, (March 1, 2021), https://www.globenewswire.com/en/news-release/2021/03/01/2184393/0/en/HUMBL-Inc-Announces-Binding-Term-Sheet-to-Acquire-Tickeri-Inc.html (last visited Sept. 22, 2022).

office tools, and a digital marketing platform, serving over 5,000 locations and operators in the Americas." *Id.*

123.     HUMBL further announced that Tickeri had $30 million in revenue in non-Covid-19 years (*Id.*), and that the deal provided the Company with $20,086,664 in goodwill. Those impressive figures overshadowed the fact that Tickeri only had $23,587 in accounts receivables and that the deal left HUMBL with a negative balance of $127,377 in net cash.[52]

124.     During the February 26, 2021 Investor Call, Foote described Tickeri as HUMBL's "crown jewel."[53] He went on to say, "[i]n a way, it's an acquire and a merger as well ... We'll keep the brand intact with Tickeri for our Latin American and Caribbean pursuits, but we'll be leaning into some of the acquired technology. We're already in talk with sports and stadiums and festivals here in the United States, in Oceania, in Latin America."

125.     One shareholder posted a 5-minute-44-second video titled "TSNPD Stock News Update! Tickeri Acquisition & Audited Financials! TSNP Stock HUMBL Stock Updates!" In the video, viewed nearly 2,500 times, the shareholder highlighted HUMBL's press release about Tickeri, particularly that Tickeri is a "leading platform featuring Latin events and artists throughout the United States, Latin America, and the Caribbean corridor," and declares: "this company is huge. I believe [HUMBL] is doing the right steps here. They are not focusing on North America. They are focusing all over the world, so this is huge friends because you know if you think about PayPal—PayPal is mostly focused on the North America ... [HUMBL is] targeting everything else that PayPal isn't trying to do... They are revolutionizing the way everything is going right now."[54]

---

[52] HUMBL, Inc., SEC Quarterly Report, at 27 (Aug. 16, 2021), https://sec.report/otc/financial-report/296437 ("8.16.21 Quarterly Report").

[53] Investor Call, at 00:20:06 (Feb. 26, 2021), https://support.humbl.com/investors/investor-call ("2.26.21 Investor Call").

[54] *TSNPD Stock News Update! Tickeri Acquisition & Audited Financials! TSNP Stock HUMBL Stock Updates!*, YOUTUBE, at 0:03:10 (March 2, 2021) https://www.youtube.com/watch?v=mNQP0HajOqE (last visited Sept. 22, 2022).

126.    The market agreed. In response to the news—and shareholders' reasonable expectation that the Tickeri acquisition would lead to material revenue for HUMBL—its share price rose by 42.06%, from $3.80 to $4.83.

127.    After officially announcing that HUMBL had entered a binding term sheet to acquire Tickeri on March 1, 2021, its share price rose another 23.81%, from $5.74 to $5.98.

128.    In reality, Tickeri did not service the "Americas." Nor did it feature events in Latin America or the Caribbean corridor. It only sold tickets to Latin music events in the United States.

129.    That Defendants had overpaid for Tickeri was not revealed to shareholders until August 16, 2021, when they disclosed in HUMBL's Quarterly Report that as of June 30, 2021, goodwill had dropped to $7,945,602 as it had to recognize $12,141,062 in impairment expense.[55]

130.    The basic procedure governing goodwill impairment tests is set out by the Financial Accounting Standards Board (FASB) in "Accounting Standards Update No. 2017-04, Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment." Events that may trigger goodwill impairment include deterioration in economic conditions, increased competition, loss of key personnel, and regulatory action.

131.    Defendants knew or should have known whether the goodwill acquired from Tickeri was overstated at the time they were negotiating the terms of the deal, based on their due diligence and valuation of Tickeri before the acquisition closed. Defendants should have at least had an estimate of the financial impact of the COVID-19 pandemic impact on Tickeri's business, if not the actual impact, as they were considering the purchase price. Regardless of whether Defendants did not have that estimate, or had the estimate but ignored it, they were reckless in going ahead with, and then boasting about, the $20M acquisition.

    5.    HUMBL NFT Gallery

132.    On May 7, 2021, HUMBL announced that it had entered into a binding term sheet to acquire Monster Creative, LLC. ("Monster"), "a leading creative advertising agency in the

---

[55] 8.16.21 Quarterly Report.

entertainment space," for $8,000,000.[56] Monster would collaborate "with HUMBL in creating multimedia NFTs and ticketing experiences for clients in sports, music, entertainment, fashion, gaming, and photography."

133.    Four days after the Hindenburg Report was issued, Defendants opportunely announced the initial launch of its NFT Gallery on May 24, 2021 and stopped the bleeding of the Company's stock price. The Gallery would "allow content creators to create NFTs and consumers to purchase them" and "provide white-glove creative services and distribution mechanisms to digital creators, artists, and entertainers in key verticals like: sports, music, entertainment, fashion, gaming and photography."[57] The launch appeared to be premature because at the time, the Gallery only included "a collection of celebrity photography from celebrity photographers Andrew Small and Jared Raskind (Smallz + Raskind)." Still, the announcement of the NFT Gallery had its desired effect, causing HUMBL share price to rise 9.58%, from $0.8599 to $0.915.

134.    Foote proceeded to tout the various partners on HUMBL's NFT platform on Twitter during the Class Period:

- 3.25.21: "HUMBL is proud to be working with MLB players like [Johnny Cueto] to be some of the first in their sport to create blockchain NFT collections."[58]
- 3.25.21: "Welcoming Nelson Cruz…to the HUMBL Family for NFTs.[59]
- 5.7.21: HUMBL "coming on as the Official NFT Provider of the Pilgrimage Festival in Sep' 2021."[60]

135.    After Foote tweeted about Johnny Cueto and Nelson Cruz joining the HUMBL NFT team, the Company's share price rose 4.19% after dropping 3.27% the day before.

---

[56] Press Release, Globe Newswire, *HUMBL Announces Binding Term Sheet to Acquire Monster Creative*, (May 7, 2021), https://www.globenewswire.com/en/news-release/2021/05/07/2225546/0/en/HUMBL-Announces-Binding-Term-Sheet-to-Acquire-Monster-Creative.html (last visited Sept. 22, 2022) ("5.7.21 Press Release").
[57] 5.24.21 Press Release.
[58] Brian Foote (@humblceo), Twitter (Mar. 25, 2022, 1:00 PM), https://twitter.com/humblceo/status/1375130574168322049.
[59] Brian Foote (@humblceo), Twitter (Mar. 25, 2021, 4:20 PM), https://twitter.com/humblceo/status/1375180823087915008.
[60] Brian Foote (@humblceo), Twitter (May 7, 2021 3:29 PM), https://twitter.com/humblceo/status/1390750662670041090.

136.    Then, on June 22, 2021, HUMBL announced that it had "retained Athletes First as a strategic consultant to focus on the development of new business verticals in areas such as Non-Fungible Tokens (NFTs), digital media and ticketing" and "support HUMBL in delivering elite, white-glove service for a select group of A-list sports and entertainment talent, with an initial focus on creating highly-curated NFT galleries[.]"[61]

137.    HUMBL then announced a re-launch of the NFT Gallery on September 7, 2021 "for the creation, lifting, sale, and purchase of Non-Fungible Tokens (NFTs) on the blockchain."[62] At this point, the Gallery included "over 15 original collections, including Smallz + Raskind, Fulton Hobbs, Des Taylor, and others across a variety of collectible digital media …"

138.    HUMBL and Foote proceeded to keep the Company buzzing and stock price inflated by regularly touting new partners for the NFT platform on twitter:

- 9.7.21 (HUMBL): A Machado x Glaser NFT was coming in September 2021.[63]

- 10.21.21 (HUMBL): A new collection was dropping on the HUMBL Gallery on October 28, 2021, featuring professional surfer Rob Machado and legendary surf photographer Todd Glaser.[64]

- 10.25.21 (HUMBL): Nick Carter was releasing his Extended Play Record and NFT Collection on Blockchain.[65]

139.    As a result of the 10.25.21 Nick Carter announcement, HUMBL share price increased by 7.76% after experiencing declines from October 18 to 22, 2021.

140.    But HUMBL had not developed its NFT Gallery. HUMBL had utilized a third-

---

[61] Press Release, Globe Newswire, *HUMBL Announces Strategic Collaboration with Athletes First* (June 22, 2021), https://www.globenewswire.com/news-release/2021/06/02/2240528/0/en/HUMBL-Announces-Strategic-Collaboration-with-Athletes-First.html (last visited Sept. 22, 2022) ("6.22.21 Press Release").
[62] 9.7.21 Press Release.
[63] HUMBL (@HUMBLPay), TWITTER (Sept. 7, 2021, 10:16 PM), https://twitter.com/HUMBLPay/status/1435426897588985858.
[64] HUMBL (@HUMBLPay), TWITTER (Oct. 21. 2021, 1:19 PM), https://twitter.com/HUMBLPay/status/1451236666480472081.
[65] Press Release, EINPRESSWIRE, *Pop Star Nick Carter To Release New EP and NFT Collection on Blockchain* (Oct. 25, 2021), https://www.einpresswire.com/article/554696996/pop-star-nick-carter-to-release-new-ep-and-nft-collection-on-blockchain (last visited Sept. 22, 2022) ("10.25.21 Press Release").

party developer's technology, which used APIs from OpenSea, for its NFT Gallery. Once again, HUMBL had simply delivered a third party's products wrapped in HUMBL labeling. Even so, the NFT Gallery's site architecture did not have basic SEO naming conventions – a necessary feature for long-term organic user growth. Without rudimentary search engine optimization, HUMBL thus knew or should have known that the NFT Gallery would not generate meaningful revenue.

141.    And notably absent from the NFT Gallery were any NFTs from the professional athletes and Olympians that HUMBL had promoted over the summer.

142.    Nor was the collaboration with Athletes First discussed during any investor call since the 6.22.21 Press Release, presumptively because nothing has come of it.

143.    Despite boasting about NFTs providing material revenues to HUMBL's business, the truth was revealed through the Company's 8.16.21 Quarterly Report, an August 18, 2021 Seeking Alpha Report[66] analyzing the 8.16.21 Quarterly Report, and a November 17, 2021 Seeking Alpha Report.[67] As the 8.18.21 SA Report highlighted, "Tickeri and Monster Creative had combined revenues of less than $1 million in H1 2021" and the 11.17.21 SA Report concluded, the Company "ha[d] a pattern of promising to disrupt an industry, launching a product that barely generates any revenues and then pivoting to another sector."

**D. Defendants Maintain a Façade of Integrity to Mislead Shareholders.**

144.    Integral to Defendants' long-game scheme was the appearance of faith in HUMBL and its products by Company insiders and the public, even (and perhaps, especially) in the face of negative press. Each Individual Defendant had a role to play and each engaged in at least one specific act in furtherance of their joint scheme to maintain value in the Company until insiders could wait out the conversion period.

---

[66] Gold Panda, *HUMBL Closes Another Humbling Quarter And I Remain Bearish*, https://seekingalpha.com/article/4450332-humbl-closes-another-humbling-quarter (Aug. 18, 2021, 8:42AM) ("8.18.21 SA Report").

[67] Gold Panda, *HUMBL Continues To Stumble*, SEEKING ALPHA, https://seekingalpha.com/article/4470402-humbl-continues-to-stumble (Nov. 17, 2021, 10:27PM) ("11.17.21 SA Report").

145.    Defendant Sharp—who routinely promoted himself as an "advocate for shareholder rights and honesty in the OTC"—used his well-branded identity to It pump Tesoro's share price just before the merger completed. In one tweet, Sharp wrote: "I didn't really realize what a big deal $TSNP & HUMBL CEO, Brian Foote, is until this weekend. I believe that he may be the Elon Musk of blockchain. He is so highly regarded that he is a keynote speaker at BC conventions around the world." At the 12.9.20 Investor Call, Sharp said: "I'm not easily impressed, but I was blown apart. This deal is going to bring credibility finally to the OTC." [1:58, 2:45]

146.    In addition to pumping the share price, Sharp deliberately withheld material information from shareholders to delay adverse reactions from the public. During the 2.26.21 investor call, Sharp said: "I made the conscious decision that we were not going to tell you and I'll tell you why: it would have created mass panic…I don't want to sound like I'm your mother, but we saved a lot of you from yourselves here." [9:55]

147.    In saying this, Sharp acknowledged that telegraphing the split would have had an adverse effect on the share price. Between the time Sharp knew that a split would occur (November 12, 2020) and the date of the actual split (February 26, 2021), HUMBL shares skyrocketed over 367%, from $0.014 to $5.15.

148.    Then when the public learned that HUMBL had quietly issued Series B Preferred shares convertible into 5.54B common shares to insiders and family members—thereby setting shareholders up for total annihilation once those shares unlocked and became available to sell— Sharp repeatedly gaslit investors. On February 26, 2021, Sharp said: "If you're worried about dilution, don't be. This is not your typical OTC stock. We believe these people are investors, not profit takers."

149.    Again, on April 18, 2021, Sharp tweeted: "if you think that 6 billion new $HMBL shares are going to suddenly appear in the O/S, then please…sell your shares." Sharp's tweet was classic gaslighting, given that 3 billion shares could suddenly appear for sale in December if insiders converted their Series B into common shares.

150.    Sharp's portrayal of HUMBL as full of diehard believers who would never sell their shares was an important part of the scheme to keep investors engaged in the Company despite its utter failure to bring a successful product to market. Foote carried this mission out flawlessly.

151.    Indeed, Foote positioned himself as the (optically) ideal CEO – one who believes in the company and its products so wholeheartedly that he would take a $1 salary and never sell a share. And, whenever shareholder resentment about dilution was on the rise, Foote deliberately retired or locked up shares to help control the narrative.

152.    For example, during a March 7, 2022 investor call, as shareholders began expressing concern about Series B, Foote committed to not selling any of his "personal shares"—which he described as 45% of the Series B class—through the end of 2022. He empathized with those who were down on their investment by stressing that he himself was alongside them as an investor and hasn't made a nickel. He assured viewers on the call that "it's actually a pretty traditional share structure."

153.    On the June 30, 2022 investor call, after the Hindenburg Report had made its rounds, Foote once again attempted to diffuse concerns about the share structure. He re-iterated that he hadn't sold a share, took a $1 salary, and pointed out that the stock was still up 264,000% in the past year—a deliberately misleading figure considering that the reverse merger of HUMBL into TSNP was essentially the resurrection of a worthless shell company. After bloviating about having retired or converted millions of shares, the visibly annoyed Foote encouraged doubters to do the math on the potential dilution ahead of them. Foote ended the segment by stating "I love the dilution FUD from preferred Bs, but it's just fear, uncertainty, and doubt."

154.    Foote referred to "dilution FUD" frequently. FUD is an abbreviation for "Fear, Uncertainty, and Doubt." It was a tactic used to manipulate public opinion about specific cryptocurrencies or the crypto market in general by disseminating false, inaccurate, or misleading information.

155.    To further support the narrative of unconditional devotion to HUMBL—and thereby convince shareholders to hold shares past the conversion date despite failing to launch any

successful products—Hinshaw used his role as HUMBL Secretary to quash the public's concerns about dilution.

156.    For example, on November 13, 2020, Hinshaw announced in a press release that Foote agreed to surrender 551,669,335 common shares that he had previously acquired from Tesoro President Boucher for "value received from Mr. Foote." Hinshaw highlighted that Foote's surrender was made without consideration, which shareholders saw as a sign that Foote was selflessly protecting shareholders from a massive float.

157.    Hinshaw also took steps to convince shareholders that withholding material information about corporate actions was in shareholders' best interests. In a press release dated February 25, 2021, Hinshaw is quoted as saying:

> The [] Board [] concluded that it was important to quell the volatility in the share price. Prospective investors and current shareholders were concerned that it was difficult to pinpoint the true value of the common shares. Furthermore, this will force any outstanding short positions to cover their position. The [B]oard was also sympathetic to the need not to wipe out the holdings of the shareholders, and therefore determined that this small reverse split would satisfy both requirements.

158.    On July 20, 2021, Jeff Hinshaw reassured the Company's shareholders that "none of the four founders of HUMBL [Foote, Hinshaw, Rivera, and Garcia] have sold a single share of HUMBL stock."

159.    On July 20, 2021, Rivera corroborated Hinshaw's tweet, stating: "None of the Co-founders of HUMBL have sold a single share." When Twitter users asked whether sales included transfers made by related entities, like a family trust or LLC, Rivera opted not to respond.

160.    Foote, Hinshaw, and Rivera's use of precise language regarding the co-founders selling personal shares was a well-crafted half-truth aimed at maintaining Defendants' façade of legitimacy and loyalty to HUMBL shareholders.

161.    In reality, the Individual Defendants appear to have benefitted from selling shares, directly or via a related party, once the shares became unrestricted.

162.    Given Foote's holdings, shareholders thought that they were in the same boat as him, but they were wrong. Foote managed to enrich his entire family without selling any of his own individual shares.

163.    In addition to announcing financing that diluted shareholders and enriched Company insiders or their family members without benefiting shareholders, Rivera appears to have hosted private shareholder events for certain investors who had a large online presence.

164.    For example, in or around September 2021, Rivera appears to have hosted an event in a private residence—not open to all HUMBL shareholders—attended by at least two social media profiles: Rebecca Williams ("Williams"), the manager of Murtaugh Group LLC ("Murtagh"), and Christina Pelz ("Pelz"), the manager of CMP76, LLC ("CMP76").[68]

165.    Further, Garcia touted the empty partnerships, knowing that the Company had nothing more than a press release to back up her claims.

166.    Each of these individuals knew about the inevitable dilution of shares by no later than November 3, 2020, when the merger was announced.

**E. The Company Issued Toxic Debt to Distract Shareholders.**

167.    In addition to announcing undeveloped products and promising not to annihilate shareholders by selling their shares, Defendants dissuaded shareholders from selling HUMBL stock in furtherance of running out the conversion clock by announcing influxes of cash via convertible notes.

168.    Defendants repeatedly announced new financing just after a negative press cycle as a means of distracting shareholders and misleading them to believe that institutions still believed in HUMBL—despite its lack of profitable products.

169.    But in most instances, Defendants knew that the Company could not or would not pay the loans back—i.e., that the debt was toxic. In other instances, Defendants knew that the creditor was unable to satisfy the financing agreement—i.e., that the financing agreement was a

---

[68] Rebecca Williams (@RebeccaWeb3), TWITTER (Sept. 25, 2021, 10:38 AM), https://twitter.com/RebeccaWeb3/status/1441774073491587082.

sham. Either way, the Company's announcements neutralized negative press, convinced shareholders that it had just received the funding necessary to develop HUMBL products to be appealing and useful, and, ultimately, inched Defendants towards their conversion date.

170.    For example, on April 14, 2021—the same day that the Company filed its first Annual Report alerting shareholders to the 10,000:1 conversion rate—HUMBL announced a $50 million Equity Financing Agreement and Bridge Note from Brighton Capital: "If HUMBL elects to cause Brighton Capital to purchase shares, the shares will be purchased at a 20% discount. HUMBL will have the right to cause Brighton Capital to purchase shares under the agreement following the effectiveness of an S-1 Registration Statement. In exchange for $3,000,000 in cash, HUMBL issued to Brighton Capital a $3,300,000 Convertible Promissory Note. The note bears interest at 10% per annum and is convertible at Brighton Capital's election at a fixed price of $3.15 per share."

171.    On July 29, 2022, HUMBL's S1 application revealed that Foote's parents, sister and cousin were investors in HUMBL LLC and owned approximately 26.67% of the investor interests in Brighton Capital.[69]

172.    Notably, the Texas Secretary of State indicates that Brighton Capital Partners, LLC was registered on March 24, 2021 – just 3 weeks before HUMBL issued the Press Release about the Equity Financing Agreement. The address of the LLC is a residential property. Indeed, there is no evidence to suggest that Brighton Capital had the capacity to fulfill a $50 million investment in HUMBL.

173.    Unsurprisingly, on October 26, 2021, the Company and Brighton agreed to terminate the Equity Finance Agreement, but HUMBL agreed to pay Brighton a termination fee in the form of 1,275,000 common shares.

174.    Foote appears to have used the news of the $50 million financing deal to negate the negative press associated with disclosing the 10,000:1 conversation rate. Then HUMBL terminated

---

[69] HUMBL, Inc., SEC Form S-1, at 55 (June 13, 2022),
https://sec.report/Document/0001493152-22-016613

the agreement, enriching Foote's family members via a termination fee paid for with common shares, and leaving HUMBL shareholders with nothing to show but additional dilution.

175.    Similarly, on May 25, 2021—just days after the Company's Q1 was released, a Seeking Alpha report was published, and the Hindenburg Report came out—the Company announced "additional bridge round investments."

176.    Again, on November 19, 2021, the Company announced that Forwardly arranged for $2 million in "non-dilutive debt financing." Notably, this announcement came on the heels of the Company's Q3 filing and a Seeking Alpha article that synthesized the Q3 filing in extremely negative terms.

177.    In other instances, Defendants appear to have strategically renegotiated debt, thereby further diluting shareholders, for promotional reasons.

178.    For example, the Company renegotiated a loan made by Murtaugh LLC, which is owned by Rebecca Williams. Williams is a prominent twitter user whose tweets about HUMBL reached more than 150,000 people. Neither she nor HUMBL ever disclosed that she was compensated for her tweets about the Company. However, on March 21, 2022, HUMBL renegotiated Murtaugh's note—which was in the amount of $382,500—and issued Murtaugh common stock equal to $669,004—nearly double the amount it had originally lent to the Company. While HUMBL appeared to receive independent social media hype, Williams actually received shares, and the other shareholders' holdings became further diluted.

179.    Similarly, on March 31, 2022, the Company renegotiated a $76,500 loan made by Christina Peltz's company, CMP76, LLC ("CMP76") thereby issuing 962,212 shares of common stock in exchange for the note. On March 31, 2022, the common stock was trading at $0.14, which would equal $134,212 (substantially more than the return on the original note).

## F. Defendants and Company Insiders Quietly Cash Out

180.    The purpose of continually launching vaporware products, announcing non-existent partnerships, and entering into sham or toxic financing was to persuade investors to ignore the reality of HUMBL until the restrictions lifted on the Series B shares on December 3, 2021.

181.    Once the restrictions lifted, Company insiders immediately began dumping their shares for massive gains.

182.    For example, the Foote Trust converted the maximum number of preferred shares each month then immediately sold the common shares. In November of 2021, the Trust owned 33,561 of Series B. The Trust sold 5% in December and 5% in January, such that by the February 11, 2022 S1 filing, the Trust only reported 30,205 Series B Preferred shares. The Trust's conversion flooded the market with 33,560,000 shares, which were trading at the time around $0.27. Given that the Trust did not report any common shares in the S1, the Trust must have sold its 33.56 million shares for approximately $9 million. As a result of the conversions in December and January, the Foote Trust fell below the 5% disclosure threshold. Nevertheless, it is not likely that the Foote Trust has changed its pattern of converting and selling the maximum number of shares each month.

183.    There was also a change in accounting methods that altered the definition of beneficial owner such that certain shares described as beneficially owned by insiders pre-conversion were later recharacterized as not beneficially owned. As a result, those recharacterized shares dropped off HUMBL's financial statements, making it impossible to decipher exactly when or how much Company insiders were benefiting from HUMBL shares.

184.    When shareholders noticed that Hinshaw and Rivera's number of shares had decreased between the various S-1 filings, Hinshaw tweeted: "The difference in the number of shares owned by me and Michele [Rivera] in the S1 was caused by a change in the way our legal and accounting firms calculated beneficial ownership and not the result of any sales of shares by me or Michele [Rivera]. Neither of us have sold any shares."

185.    Unsurprisingly, each of the Individual Defendants have an entity that is outside the Company's definition of "beneficial ownership"—*i.e.*, each Individual Defendant was able to dump shares while maintaining their appearance of loyalty.

186.    For example, Foote, Hinshaw, Garcia, and Rivera are beneficial owners of Block 30, which received 249,707 Series B shares during the merger. As such, they each benefited from Block 30's common share sales.

187.    Hinshaw and/or his family benefited via the entity, HinCamp, LLC, which sold millions of shares.[70] The July 20, 2022 S-1 lists HinCamp, LLC as a "selling stockholder" set to sell up to 2,410,000 shares of common stock.[71]

188.    Rivera or her family benefited via BRNR, LLC, which received 1,933 Series B shares during the merger.

189.    Sharp or his family benefited from the sale of Forwardly's common shares (previously converted from Series B). For example, the Company reported that Forwardly planned to sell 125,000,000 shares in its July 20, 2022 S-1 filing.

**G. Defendants Make Materially False and/or Misleading Statements**

190.    On November 12, 2020, HUMBL announced via a press release ("11.12.20 Press Release") a reverse merger with Tesoro Enterprises, Inc. ("Tesoro") which allowed it to become a publicly traded company.[72] In the all-stock transaction, members of HUMBL received preferred shares of Tesoro in exchange for their HUMBL holdings. The Press Release stated, in part:

> **HUMBL has designed a mobile wallet (HUMBL)** and merchant software (HUMBL Hub), that help primarily cash economies migrate to digital money services across key vertical markets, such as: government, banking, wireless carriers and merchant services.
>
> * * *
>
> **The HUMBL® Mobile App delivers borderless transactions**, by integrating multiple currencies, payment methods, banks and financial services providers into

---

[70] Hinshaw's bio on the Wall Street Journal states that he is a Manager of HinCamp, LLC. *See* WSJ MARKETS, *HUMBL, Inc.*, https://www.wsj.com/market-data/quotes/HMBL/company-people/executive-profile/199713278 (last visited Sept. 22, 2022).

[71] HUMBL, Inc., SEC Form S-1, at 29 (July 20, 2022), http://edgar.secdatabase.com/1690/149315222019905/filing-main.htm ("7.20.22 S-1").

[72] Press Release, GlobeNewswire, *Tesoro Enterprises, Inc. to Merge with HUMBL, LLC – A Global Payments and Financial Services Network* (Nov. 12, 2020), https://www.globenewswire.com/en/news-release/2020/11/12/2125662/0/en/Tesoro-Enterprises-Inc-to-Merge-with-HUMBL-LLC-A-Global-Payments-and-Financial-Services-Network.html (last visited Sept. 22, 2022) ("11.12.20 Press Release").

one-click for the customer. ***HUMBL® provides greater access and portability than US only mobile wallet providers, such as Venmo® and Zelle®.***

191.    The 11.12.20 Press Release announcing the reverse merger omitted material facts from investors, including that the mobile wallet's design was nowhere near done and the mobile wallet did not have basic functionality at the time.

192.    Since investors were in the dark about these material facts, investors' understanding from Defendants' 11.12.20 Press Release was that HUMBL was already "us[ing] a mobile wallet that connects debit, credit and digital dollars – with a point-of-sale (POS) system called HUMBL Hubs – to instantly connect the way money moves between consumers and merchants in markets such as LatAm, Africa, India and Oceania."[73]

193.    Further, the 11.12.20 Press Release only stated that Defendant Foote had acquired "the control block of voting shares" as well as "a significant number of common shares."[74] Then, the next day, the Company issued a press release stating that Defendant Foote had "retired" 551 million shares without consideration, significantly lowering the overall share count.[75]

194.    Shortly thereafter on November 17, 2020, HUMBL issued another press release announcing that Defendant Foote would "lock up" an additional 318 million common shares.[76] The press release stated:

> Tesoro Enterprises, Inc. (OTC Pink: TSNP) ("Tesoro") announced today that the company's CEO and President, Brian Foote, has agreed to convert over 318 million shares recently purchased by him out of the retail market to a new class of Preferred shares.
>
> The conversion will be transacted following the imminent completion of the merger between Tesoro and HUMBL LLC, which will coincide with the redomiciling of the corporation to Delaware.

---

[73] Maren Thomas Bannon, *Rising Startups To Watch With Diverse Founders*, FORBES (June 25, 2020, 2:23 PM), https://www.forbes.com/sites/marenbannon/2020/06/25/rising-startups-to-watch-with-diverse-founders/?sh=18630c8c330d.

[74] 11.12.20 Press Release.

[75] Press Release, GlobeNewswire, *Tesoro Enterprises, Inc. Retires Over 551 Million Common Shares* (Nov. 13, 2020), https://www.globenewswire.com/news-release/2020/11/13/2126553/0/en/Tesoro-Enterprises-Inc-Retires-Over-551-Million-Common-Shares.html (last visited Sept. 22, 2022) ("11.13.20 Press Release").

[76] 11.17.20 Press Release.

> Upon completion of the conversion, Tesoro's issued and outstanding number of common shares will have been reduced by over 860 million shares since Mr. Foote became President of Tesoro.
>
> The company does not anticipate that the number of common shares outstanding will increase during the remainder of 2020 and throughout 2021.

195.    On November 24, 2020, HUMBL issued a press release entitled "HUMBL Partners with Cyberbeat to Expand into Asia Pacific and Pan-India Vertical Markets" which announced that the Singapore-based company, Cyberbeat, was making a strategic investment into HUMBL.[77] The release brags that Cyberbeat is "a leading digital payments and financial technologies company led by veteran digital payment industry executives of the Asia Pacific region" and that Cyberbeat "gains the non-exclusive rights to sell, distribute and deploy HUMBL and HUMBL Hubs technologies into key verticals in the Asia Pacific in calendar year 2021 and beyond." HUMBL noted that the Company viewed the deal as an "opportunity to establish this global relationship with a proven winner in the Asia Pacific region[.]"

196.    On December 1, 2020, HUMBL issued a press release entitled "HUMBL Mobile App and HUMBL Hub Merchant Solutions Deliver Successful Pilot Transactions Between United States and Mexico."[78] In this release, HUMBL announced a purportedly successful pilot project with merchants in Mexico and quoted a tour operator named Fernando Cuevas who noted that HUMBL "makes life easier for me, my business and my customers here in Mexico" and that HUMBL's digital payments "enables my customers to spend more time enjoying their trips, and less time seeking out ATM's and cash payment options everywhere we go."

197.    The reverse merger closed on December 3, 2020. The reverse merger was shepherded by OTC investor Defendant George Sharp, who described himself during HUMBL's debut webcast as "an advocate for shareholder rights and honesty in the OTC."

---

[77] 11.24.20 Press Release.
[78] 12.1.20 Press Release.

198.    During the 12.9.20 Investor Call, Defendant Foote falsely stated that "Right now, in the barn, we have – send money, request money, exchange money, stable coins" on the Pay App.[79]

199.    Also on the 12.9.20 Investor Call, Defendant Foote explained that one reason that HUMBL is based in San Diego is the proximity to the Mexican market, stating that "Part of the reason our business was born here is the majority of merchants in Mexico are in cash still, like physical paper bills and coins."[80] Foote falsely stated that the Company was surprised by the strong demand for the app in Mexico, noting that "I challenged our Mexico sales team. I said 'OK. Go sign up 100 merchants in a week.' They came back with 300 merchants in three days."[81]

200.    On January 22, 2021, in a letter to shareholders, Defendant Foote told investors that the Company had secured "our first of multiple option payments on the distribution rights deal in Oceania region" with "plans to enter the region with this group."[82] It was later announced that an Australian entity called Tuigamala Group Pty Ltd. ("TGP") had paid $600,000 in December for an option to purchase territory rights, with plans to invest an aggregate $15 million.[83] The $600,000 payment also granted TGP 12.5 million warrants at $1 each.

201.    In response to the Company's international partnership announcements, the stock price soared, reaching $6.84 on February 8, 2021.

202.    On February 25, 2021, HUMBL took advantage of the inflated stock price to announce that FINRA processed recent corporate actions, including the name change from Tesoro to HUMBL, and that the Company executed a one for four reverse split of its common stock and

---

[79] 12.9.20 Investor Call at 00:25:26.
[80] *Id.* at 00:15:47.
[81] *Id.* at 00:26:24.
[82] 1.22.21 Shareholder Letter.
[83] 7.20.22 S-1.

made other changes to its share structure.[84] HUMBL's COO and Corporate Secretary, Jeffrey Hinshaw, stated:

> The company's Board of Directors concluded that it was important to quell the volatility in the share price. Prospective investors and current shareholders were concerned that it was difficult to pinpoint the true value of the common shares. Furthermore, this will force any outstanding short positions to cover their position. The board was also sympathetic to the need not to wipe out the holdings of the shareholders, and therefore determined that this small reverse split would satisfy both requirements.

203.    Thereafter Defendant Sharp attempted to downplay the concern shareholders expressed about the corporate action and assuage those who were concerned about potential dilution, stating: "If you're worried about dilution, don't be."[85] Sharp also told investors that he was doing them a favor by being opaque about the Company's actions, such as the surprise reverse stock split, stating, "I have made the conscious decision that we were not going to tell you..."[86]

204.    The price of HUMBL stock declined following the announcement of the reverse split, but the downplaying of the potential dilution by the Company and Defendant Sharp, coupled with a continued string of announcements about HUMBL's international partnerships and growth prospects, kept the stock price artificially inflated for the rest of the Class Period.

205.    For example, on March 16, 2021, HUMBL issued a press release announcing "Aurea Group Ventures Investment and Partnership for Exclusive Chile Country Rights" which was an international deal with a Chilean entity named the Aurea Group.[87] The release noted that the partners are "already underway on HUMBL Latin America business development discussions

---

[84] Press Release, GlobeNewswire, *HUMBL, Inc. Completes Corporate Actions*, (Feb. 25, 2021), https://www.globenewswire.com/en/news-release/2021/02/25/2182875/0/en/HUMBL-Inc-Completes-Corporate-Actions.html (last visited Sept. 22, 2022) ("2.25.21 Press Release").

[85] 2.26.21 Investor Call at 00:09:23.

[86] *Id.* at 00:09:58.

[87] Press Release, GlobeNewswire, *HUMBL, Inc. Announces Aurea Group Ventures Investment and Partnership for Exclusive Chile Country Rights*, (March 16, 2021), https://www.globenewswire.com/en/news-release/2021/03/16/2193788/0/en/HUMBL-Inc-Announces-Aurea-Group-Ventures-Investment-and-Partnership-for-Exclusive-Chile-Country-Rights.html (last visited Sept. 22, 2022) ("3.16.2021 Press Release").

in key verticals such as: banking, merchant and financial services, real estate, hospitality, tourism, sports, festivals, entertainment and ticketing services in the region."

**H. The Truth Leaks Out to Investors**

206.    After markets closed on April 14, 2021, HUMBL issued its Annual Report revealing that each of the 552,522 shares of newly created Series B Preferred Stock from the Tesoro reverse merger "shall be convertible at the option of the holder thereof at any time after December 3, 2021…into ten thousand (10,000) fully paid and nonassessable shares of common stock."[88]

207.    An analyst at Seeking Alpha analyzed the Annual Report and on April 18, 2021, published a research report concluding that if "all Series B preferred shares are converted, HUMBL is valued at $16.9 billion" despite "barely any investment in development and just $1.8 million of assets as of December."[89]

208.    On this news, HUMBL's share prices fell over 53%.

209.    Then, on May 20, 2021, Hindenburg published a research report entitled "HUMBL: Illusions of Grandeur, Collapsing International Deals, And Lurking Dilution" which called into serious question the business and financial prospects of HUMBL.

210.    For example, the Hindenburg Report stated that despite the previous statements concerning the working features of the Pay App, basic features were still not functioning. Researchers with Hindenburg found that there was no way to send, receive, or request money between users or to even know which users were on the platform. Furthermore, there was no indication that users could do anything with stablecoins.

211.    The Hindenburg Report also analyzed the reviews that the Pay App received on the Apple App Store. Despite the shortcoming of the functionality, the app immediately received a suspiciously high number of positive reviews in the days following the launch. In the following

---

[88] Annual Report.

[89] Gold Panda, *HUMBL – I'm even More Bearish After The Release of 2020 Results*, SEEKING ALPHA (Apr. 18, 2021, 6:16 AM), https://seekingalpha.com/article/4419613-humbl-even-more-bearish-after-2020-results ("4.18.21 SA Report").

weeks, however, the number of Apple App Store reviews plummeted, trickling off to zero new reviews in the weeks following the launch, indicating coordinated efforts to influence perceptions around the app.

212.    For example, the Hindenburg Report highlighted a five-star review praising the app's ability to "send money back and forth between family and friends" a feature the Hindenburg Report noted that the Pay App was unable to do. Similarly, another misleading five-star reviewer claimed to be deleting Robinhood, PayPal, Venmo, and Etsy because the Pay App does everything those apps do, which was untrue based on the Hindenburg Report's analysis of the Pay App.

213.    Despite the press release announcing the Pay App, explaining that users would be able to "discover merchants; as well as pay, tip, rate and review those same merchants in contactless transactions," the Hindenburg Report found that discovering merchants on the system was problematic in that almost all of the merchants appeared to be in San Diego or New York City. Further, searches for a region pulled up inaccurate listings, including merchants far outside the region. Even if a merchant could be successfully located, the vast majority of the merchants just didn't accept HUMBL. The Hindenburg Report noted that out of 200 merchant listings on HUMBL Pay, just nine merchants were identified as taking payments via the Pay App. When Hindenburg contacted the supposed HUMBL Pay-accepting merchants, a sampling of responses stated that they had "never heard of it."

214.    The Hindenburg Report also called into question the viability of the HUMBL Marketplace, where merchants can purportedly operate an online business and accept online payments for their products. These merchants, however, did not receive payments via HUMBL. Instead, the Hindenburg Report noted that transactions were being processed by Stripe, one of the largest online payment processors in the world and a direct competitor to HUMBL.

215.    With respect to the ETX unregistered securities products, the Hindenburg Report noted the convoluted process required to access the ETX products. Although HUMBL boasted that

it developed 20,000 lines of proprietary code to create its trading strategies,[90] the strategies appear to be simple rebalancing of assets. For example, when Hindenburg researchers signed up for the Block 3 product, its portfolio was 50% BTC, 25% ETH, and 25% Litecoin. Later, the allocation simply shifted to 50% BTC, 25% Litecoin, and 25% Digibyte.

216.    With respect to HUMBL's Mexican operations, the Hindenburg Report noted that, in contrast to Defendant Foote's statements on the December investor conference call, researchers could not find anywhere near 300 merchants on HUMBL Pay in Mexico. Using the map feature, Hindenburg researchers located only 19 merchants in total and identified two as purportedly accepting HUMBL payments. One merchant was "told that they had the HUMBL system but had not yet been trained on it" while the other "had never heard of HUMBL[.]"

217.    The Hindenburg Report also called into question the account of the tour guide, Fernando Cuevas. Although HUMBL announced that HUMBL Pay had launched in Mexico, when Hindenburg researchers contacted Cuevas, they found that HUMBL's previous statements were inaccurate. Cuevas, who was also HUMBL's "lead affiliate sales representative in the region" indicated that the app wasn't ready, and that until modifications were made to the app, no merchants in Mexico would be able to use it. The Hindenburg Report then noted that Cuevas quickly deleted his messages and told researchers that he couldn't speak on the matter further.

218.    A winery and wine bar featured in the "Borderless Day in Baja" video contacted by Hindenburg also disavowed the use of HUMBL. All told, the Hindenburg researchers found no sign that HUMBL was revolutionizing the payments business in Mexico.

219.    With respect to the Indian partnership, Hindenburg researchers spoke with Nayan Raut, who was listed as the contact in the press release announcing the deal.[91] He told Hindenburg

---

[90] Press Release, GlobeNewswire, *HUMBL Announces Launch of BLOCK Exchange Traded Index (ETX) Products in the United States* (Apr. 1, 2021), https://www.globenewswire.com/news-release/2021/04/01/2203359/0/en/HUMBL-Announces-Launch-of-BLOCK-Exchange-Traded-Index-ETX-Products-in-the-United-States.html (last visited Sept. 22, 2022) ("4.1.21 Press Release").

[91] 3.20.20 Press Release.

that the partnership never actually went ahead, because Digital India Payments' agent network shut down due to the pandemic. Moreover, Raut noted that there were longer term issues, including that government regulations in India do not allow a payment platform to charge merchants or consumers any percentage, significantly hampering HUMBL's planned business model.

220.    Summing up the Digital India Payments partnership, the Hindenburg Report noted that "beyond the press release, HUMBL's India deal didn't happen, probably won't happen, and if it somehow did happen, wouldn't make HUMBL any money due to regulatory hurdles."

221.    With respect to the One Kiosk partnership in Nigeria, Hindenburg reached out to Olatunbosun Babatunde, One Kiosk's Chief Technology Officer. Babatunde, who thanked Hindenburg researchers for the inquiry, revealed that "HUMBL actually reach[ed] out to us and they wanted One Kiosk to use their payment system on our platform as a way of entering the African market. But it never went beyond that."

222.    As to HUMBL's Oceania partnership, the Hindenburg Report disclosed that there was no online or physical evidence of HUMBL's purported partner TPG beyond filings with the Australian Securities and Investments Commission. The entity was created on September 16, 2019, and is owned by Julius Elisara Tuigamala.[92] Far from having a significant foothold in the region with a network of merchants or consumers, the company's principal place of business simply appears to be Tuigamala's house in New Zealand.

223.    HUMBL's purported "strategic investment" from "proven winner" Cyberbeat was similarly revealed to be misleading. As the Hindenburg Report noted, Cyberbeat had only been incorporated in December 2019 and that LinkedIn only listed two employees, the two directors in local Singapore government filings.[93] While it is unclear how much Cyberbeat actually invested in HUMBL, Cyberbeat and its two employees received Series B preferred shares convertible into 15,930,000 HUMBL common shares (valued at approximately $14M at the time of the Hindenburg

---

[92] https://www.slideshare.net/secret/GBpfyfKTn898YY.
[93] https://www.slideshare.net/secret/rqiy39OzWKzZky.

Report's exposé). Six months following the announcement of the deal, the Hindenburg Report found no evidence that any specific initiatives or business had resulted from the purported deal.

224.    With respect to the Chilean partnership, the Hindenburg Report detailed that the Aurea Group had only been incorporated for a year before the HUMBL deal was announced. The Aurea CEO even told Hindenburg researchers by phone that HUMBL was only "the first company we have formed an alliance with...." Similarly, the Hindenburg Report noted that HUMBL had yet to articulate an actionable strategy for partnering in Chile with a technology or payment company.

225.    Following the publication of the Hindenburg Report and the revelations regarding years of misleading statements by the Company, the price of HUMBL stock dropped significantly from approximately $0.98 on May 19, 2021 to $0.76 on May 20, 2021. A Seeking Alpha article entitled "HUMBL falls after new short report from Hindenburg Research (update)" attributed the price of HUMBL shares dropping to the release of the Hindenburg Report.[94] The May 20, 2021 price represented an 88.8% drop from inflated peak price of $6.84 in February 2021.

226.    Despite the publication of the Hindenburg Report, HUMBL continued to take actions to mislead and damage shareholders. For example, on October 29, 2021, the Company issued a press release entitled "HUMBL Announces Amendment to Certificate of Incorporation to Institute Preferred B Conversion Limits."[95] This press release noted that shareholders who owned more than 750 Series B shares would be subject to limitations on how many Series B shares could be converted into common stock in any given month from December 2021 through May 2023. Each Series B preferred share could be converted into 10,000 common shares. While those who

---

[94] Joshua Fineman, *HUMBL falls after new short report from Hindenburg Research (update)*, SEEKING ALPHA (May 20, 2021, 9:16 AM), https://seekingalpha.com/news/3698657-humbl-falls-after-new-short-report-from-hindenburg-research ("5/20/21 SA Report").

[95] Press Release, EIN Newswires, *HUMBL Announces Amendment to Certificate of Incorporation to Institute Preferred B Conversion Limits* (Oct. 29, 2021), https://www.einnews.com/pr_news/555087989/humbl-announces-amendment-to-certificate-of-incorporation-to-institute-preferred-b-conversion-limits (last visited Sept. 22, 2022) ("10.29.21 Press Release").

owned more than 750 Series B shares were subject to limitations, the restrictions did not apply to shareholders who owned less than 750 Series B shares.

227.    Then, the final piece of the fraud was revealed on November 17, 2021 when Gold Panda issued a research report entitled "HUMBL Continues To Stumble," which analyzed it's financial situation and concluded that "HUMBL has a pattern of promising to disrupt an industry, launching a product that barely generates any revenues and then pivoting to another sector."[96] The 11.17.21 SA Report laid out why the new products HUMBL announced in September, NFT and ticketing platforms, will not perform "considering how bad its other products have done."

228.    Following this news, shares of HUMBL fell over 16%, to close at $0.4026 on November 18, 2021.

229.    What HUMBL shareholders expected regarding extreme share dilution was confirmed when, beginning in December 2021, owners of Series B shares began to convert into common stock. This was the dilution that shareholders were told not to worry about during the reverse merger transactions. For example, as of December 23, 2021, there were 947.3 million shares of common stock outstanding. By April 25, 2022, there were 1.429 billion shares of common stock outstanding. This was an increase of over 50% of the outstanding common shares as of December 23, 2021. The extreme dilution coincided with extremely high transaction volume and a sharp drop in the price of HUMBL common stock. As of December 23, 2021, the stock price was approximately $0.39 per share; by April 25, 2022, the price had dropped all the way to $0.11 on high volume throughout the period.

230.    On February 14, 2022, HUMBL issued a press release entitled "HUMBL Suspends BLOCK ETX Subscription Products" announcing its suspension of the ETX subscription program. Defendant Foote stated, "We do not believe that our non-custodial, algorithmically driven, software-as-a-service- BLOCK ETX subscription products are securities, nor that the underlying

---

[96] 11.17.21 SA Report.

digital assets are securities" adding that "after additional dialogue with the SEC surrounding our S-1 filing, we've determined this is the best path forward in the approval process."[97]

231.    Contrary to Defendants' statements during the Class Period, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.[98]

232.    Recently, litigation involving HUMBL exposed its *modus operandi* with toxic lenders and share dilution. On March 13, 2024 HUMBL sued one of its former lending partners for breach of contract and securities fraud. In so doing, HUMBL laid bare its use of toxic lending firms and succinctly describes the mechanisms of the fraudulent scheme alleged herein. According to HUMBL, its long-time lender was "a toxic lender that specializes in predatory lending practices" that would provide "financing in the form of convertible debt—that is, debt that can be converted to stock, almost always at a steep discount to market price." *See* Complaint ¶15 et seq., *HUMBL, Inc., v. Pacific Lion LLC et al.,* Case No. 24-cv-0495 (S.D. Cal.). HUMBL stated that its toxic lender then "converts and sells in large volumes, typically liquidating only a fraction of its debt holdings at a time to ensure that an entire tranche is sold before the next tranche is converted at a discount to the new, still lower, price." *Id.* Finally, HUMBL further alleges that its connection to these toxic lending practices would "cause share prices to plummet." *Id.*

233.    As of the filing of this complaint, the price of HUMBL common stock has not recovered. If anything, Defendants' fraud is ongoing. The Company continues diluting shareholders and hyping new business lines pursuant to its pump-and-pivot dilution strategy. As

---

[97] Press Release, GlobeNewswire, *HUMBL Suspends BLOCK ETX Subscription Products* (Feb. 14, 2022), https://www.globenewswire.com/en/news-release/2022/02/14/2384377/0/en/HUMBL-Suspends-BLOCK-ETX-Subscription-Products.html (last visited Sept. 22, 2022) ("2.14.22 Press Release").

[98] *Detailed Walkthrough of the New HUMBL Wallet*, WEB 3 INFORMER (July 26, 2022), https://www.web3informer.com/humblwalletwalkthrough-2/.

of April 8, 2025, HUMBL shares trade for approximately $0.00030. Outstanding shares have skyrocketed to **over 22.9 billion** shares as of November 19, 2024.[99]

234.    The Company's share price is down over 99.9% off its Class Period high.  Anyone who invested during the Class Period and continued to hold their shares has suffered a total loss of their investment.

**I.    Additional Allegations Related to the Unregistered BLOCK ETX Products**

235.    The creation of the BLOCKS ETX was created, in part, to offload the thinly-traded token, DigiByte, onto ETX purchasers.

236.    On November 16, 2018, a company known as BLOCK 30 LABs, announced that it was releasing the "Block 30 Index" to "help investors track multiple factors beyond bitcoin. In the press release, Defendant Foote stated "[w]e studied the historical indexes of the past – many of which are still in use today - took that learning and applied some new innovations for the digital trading markets." Founder of DigiByte, Jared Tate, is quoted in the press release, stating: "There has been so much confusion on how to accurately measure the broader performance of this new asset class," and that "BLOCK 30 is a major step forward towards getting an accurate gauge on the overall health of the market."

237.    On March 3, 2019, DigiByte Awareness core member Ben Convery tweeted that Block 30 Labs has "something special going on" and is glad that Digibyte "will be a part of it."

238.    On March 14, 2019, DigiByte announced that Block 30 Labs as a partner at the first DigiByte Global Summit to take place in Amsterdam. DigiByte founder Jared Tate stated, "The full ecosystem vision of BLOCK 30 Labs is a perfect match for the vision of where we want to go with DigiAssets moving forward".

239.    On April 5, 2019, Coinbook and BLOCK 30 Financial announced the official US launch of the BLOCK Exchange Traded Index (ETX) products. Defendant Foote stated: "We

---

[99]    Quarterly    Report    on    Form    10-Q    (November    19,    2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001119190/000149315224046795/form10-q.htm (last visited April 8, 2025).

looked very closely at customers 40 and under, in terms of how we all consume digital media and make product purchasing decisions…Overwhelmingly, the data shows that aging Wall Street products are striking out big with the next generation of investors," Defendant Hinshaw was the point of contact listed in the press release for BLOCK 30 Financial.

240.    On April 9, 2019, Block 30 tweeted that the BLOCK 30 Index ETX token will be available to global investors with its purported new partner Blackmoon FG. DigiByte founder Tate retweeted Block 30's announcement, and stated "I hear there is much more good info to come here." Just four days later, however, on April 13, 2020, Blackmoon announced that it was closing its doors. Blackmoon CEO told CoinDesk that high regulatory compliance costs were the reason for the exchange's closure.

241.    On April 19, 2019, Block 30 tweeted it was ready for the first annual DigiByte blockchain summit in Amsterdam. Throughout April 2019, Block 30 tweeted several times about DigiByte, Block 30's partnership with DigiByte, and highlighted a party boat ride in Amsterdam attended by BLOCK 30 and Digibyte executives, including Defendant Foote and DigiByte founder Jared Tate. On May 1, 20219, DigiByte released a YouTube interview with Defendant Foote discussing BLOCK 30 Financial.

242.    In October 2020, BLOCK 30 Financial issued a purported white paper for its Market Indexes and Financial Products. The creator and lead author of the document was Brian Foote, with co-authors Adam Wolfe, Jeff Hinshaw, and Calvin Weight.

243.    On November 30, 2020, BLOCK 30 tweeted in reference to HUMBL, referring to it has a "collaborative partner." Shortly thereafter, BLOCK 30 became part of HUMBL and part of Defendants' broader strategy related to the Tesoro Enterprises reverse merger.

244.    In December 2020, a new entity known as "HUMBL FINANCIAL" issued a white paper of its own, drawing heavily on the while paper previously issued by BLOCK 30. The "creator and lead author" was Defendant Foote. Adam Wolfe, Jeff Hinshaw, and Calvin Weight were also listed as co-authors. The abstract states:

HUMBL Financial™ notes that Mutual Funds and ETFs house an estimated $63 Trillion of investment from customers seeking simple, "one-click" portfolio exposure to a basket of assets.

HUMBL Financial™ is therefore developing automated, robotically traded strategies, called BLOCK Exchange Traded Indexes (BLOCK ETXs), for "one-click" investment into the new, digital asset markets and future blockchain-based trading markets.

HUMBL Financial™ proposes starting first with: a) non-custodial, robotically traded and automated strategies that can be selected by customers across index, active and thematic vectors of investing.

HUMBL Financial™ believes that "tokenization" holds opportunities for a variety of assets over time, such as stocks, bonds, funds and physical assets on the blockchain. These products would require greater levels of "custodianship" and are therefore placed in the future roadmap.

HUMBL Financial™ is also exploring blockchain-based enhancement features such as: 24/7 uptimes, automated rebalancing, reduced gas fees, price matching and oracle functionalities that have proven burdensome for early iterations of digital trading markets migration onto the blockchain.

HUMBL Financial™ notes that its BLOCK ETX strategies are outperforming an estimated $63 Trillion of unlevered Mutual Funds and ETFs through Calendar Year 2020, based on simulated and backtested performance.* US News and World Report, December 22, 2020.

HUMBL Financial™ has not yet made available these investment strategies to the public investing markets and is working with a portfolio of global law firms to determine the highest standards of compliance for regulatory consideration and review.

245.    The HUMBL FINANCIAL white paper goes on to state that:


BLOCK 30 constituent assets are ranked through a proprietary combination of market capitalization, trading volume, sector balance and in-depth due diligence on market conditions. The index aims to build a similar distribution of position concentrations as standard equity indexes.

*        *        *

The BLOCK 30 Constant is adjusted quarterly, or in certain conditions more frequently, such that the dispersion between the largest and smallest asset exposures in the index best represent the makeup of the broader digital asset market. Because of the still relative immaturity and volatile nature of digital assets as a trading category, the BLOCK 30 Constant allows for a touch of "active" management in an otherwise passive investment index. This ensures future relevance for the BLOCK 30 Index, by allowing the computation to accurately reflect the dominant assets of the industry as it evolves over decades time.

*        *        *

BLOCK Indexes are already in use in the global markets, and The BLOCKS Team will be making an announcement in Calendar Year 2021, regarding a signed partnership between one of the world's most prominent indexing firms, headquartered in the United States, with indexes and financial products that have appeared on networks like CNBC, Fox Business, Bloomberg and in areas ranging from online retail, to solar, batteries, mining, industrials and blockchain.

246.    The whitepaper described the methodology used by HUMBL for selecting the particular digital assets to be included in the BLOCK ETX Index products, explaining that the "digital asset baskets" are "selected based on stability of governance, term of existence, contribution to the digital space, strength of community, and asset economics, such as money supply inflation, scarcity, and utility." The whitepaper then describes the investor onboarding process and the monetary incentives being offered to BLOCK ETX investors. For example, the whitepaper states that "in order to purchase BLOCK ETX Index products, a customer will deposit or transfer fiat currency or digital assets like BLOCKS into a wallet account. This account can then be used to purchase the financial products on decentralized or centralized digital trading exchanges." Under the " BLOCKS for Product Discounts and Feature Unlocks" section of the whitepaper, HUMBL stated: "If using BLOCKS to purchase these products, customers will receive reduced trading fees, quarterly AUM fee discounts or have access to further BLOCK ETX product unlocks that may not be available via Bitcoin or other digital assets." The whitepaper goes on that "[o]nce onboarded, these BLOCK Index ETX assets become synthetically represented baskets of 'one-click' financial products that retail or institutional investors can purchase on both decentralized and centralized digital exchanges in the form of a smart contract."

247.    In a section titled "HUMBL Financial Trading Algorithms Help Reduce Slippage and Fees," the whitepaper explains how investors in the BLOCK Index ETXs purchase orders are pooled into large buy orders "to avoid slippage and generate much lower maker order fees as opposed to taker fees, which can reduce the profitability of the smart rebalancing." Then, "[u]pon the sale of a BLOCK ETX Index product, all assets can be sold at market prices to return Bitcoin, BLOCKS® or other another liquidation asset of choice to the investor."

248.    The whitepaper further describes the proprietary trading algorithms used by HUMBL in connection with the BLOCK ETX products:

> BLOCK Active ETXs can be used to provide investors with enhanced protection and returns during a variety of market conditions, including downside protection. BLOCK Active ETXs are complex trading strategies that have been developed, coded, and simulated over the past 4 years over a variety of asset pairs.
>
> *       *       *
>
> As profits or losses are taken, this increased or decreased capital is immediately spread to all assets under management within the iteration of the active strategy, so that we give maximum exposure to each ideal trading opportunity as profits are taken or exposure reduced if our overall balance is reduced.
>
> The benefit is that the asset mix balance is maintained throughout the trading process. The expectation is to increase the total assets under management while keeping a diversified exposure to the selected group of assets.
>
> The HUMBL Financial™ trading algorithms are constructed in a manner so as to reduce fees at the exchange level. Small-limit orders are placed to fill large orders over time, so that we can avoid slippage and generate much lower maker fees as opposed to taker fees, which can reduce the profitability of the smart rebalancing.

249.    The whitepaper further explains how investors in BLOCKS tokens—the native token for the BLOCKS ETX ecosystem—"receive added unlocks, discounts, and staking opportunities when purchasing the products in BLOCKS."

250.    On January 13, 2021, BLOCK 30 Labs tweeted that it was officially closing for business.

251.    On February 2, 2021, HUMBL announced that it was purportedly launching the BLOCK Exchange Traded Index (ETXs) lineup in 100 countries. The press release stated:

> The initial BLOCK ETXs include the: BLOCK 3, BLOCK 5, BLOCK 10, BLOCK Government, BLOCK Platform, BLOCK Global Enterprise, BLOCK RSI Fractals, BLOCK MACD & VI, and BLOCK Oscillators.
>
> The BLOCK ETX lines were created by HUMBL Financial to give retail investors access to "one-click" software services on the new digital asset trading markets. The BLOCK ETXs track three different vertical themes: Index, Active and Thematic strategies, allowing customers simplified portfolio exposure to new blockchain trading markets.
>
> "If you look at investing in Mutual Funds and ETFs over the last century, multi-asset baskets have traditionally been an easy way for customers to buy and hold

over the long-term," said Calvin Weight, Chief Market Strategist at HUMBL Financial. "BLOCK ETXs deliver new technologies in a proven format, for the blockchain trading markets, and other asset classes over time."

These BLOCK ETXs are not intended to be investment services or advice, but rather, are completely non-custodial, algorithmically-driven financial technology services that allow customers to purchase and hold digital assets in pre-set allocations through their own exchange accounts.

"Our long-term mission at HUMBL is to develop a Web 3 platform that will allow you to invest, trade, track and pay in more synthetic ways on the blockchain," said Brian Foote, CEO of HUMBL. "The BLOCK ETXs are a critical step in that journey and will expand across multiple asset types in the coming year."

HUMBL Financial is also open to the licensing of BLOCK Indexes and BLOCK ETXs to major, global financial institutions that may want to expand their digital asset offerings for customers immediately.

252.    On March 30, 2021, Digi Corp Labs CEO Rudy Bouwman tweeted that "As long as $DGB is not available on @coinbase and @BinanceUS the ETX containing DGB will not be available or have a slightly different composition. Patience is a virtue. @HUMBLPay @humblceo @HUMBL_IR[.]"

253.    On April 1, 2021, HUMBL announced the launch of BLOCK ETX products in the United States, stating:

HUMBL, Inc.(OTCMARKETS: HMBL) announced today the planned availability of its BLOCK Exchange Traded Index (ETXs) products to United States customers beginning on April 2, 2021.

HUMBL Financial™ created its BLOCK ETX products to simplify digital asset investing for customers and institutions seeking exposure to a new, 24/7 digital asset class.

HUMBL Financial has developed proprietary, multi-factor blockchain indexes, trading algorithms and financial services for the new digital asset trading markets.

BLOCK ETXs comprise over 20,000 lines of proprietary code and are architected across index, active and thematic investment strategies.

BLOCK ETXs are completely non-custodial, algorithmically driven software services that allow customers to purchase and hold digital assets in pre-set allocations through their own digital asset exchange accounts.

BLOCK ETXs will be compatible for United States customers who have accounts with Coinbase Pro, Bittrex US or Binance US.

BLOCK ETXs are also available to non-US customers who have accounts with Bittrex Global.

BLOCK ETXs will be served first on the desktop and web version of the HUMBL platform, with the goal of future applications inside the HUMBL Mobile Application.

HUMBL Financial is open to the licensing of the BLOCK ETXs to institutions and exchanges.

HUMBL Financial also plans to offer trusted, third party financial services in areas such as payments, investments, credit card services and lending across the HUMBL platform over time.

HUMBL Financial is led by the former CEO of Coinbook, Calvin Weight, as well as Jacob Davis, Sr. VP, Blockchain and Algorithm Technologies, and is advised by Jane Edmondson, CEO of EQM Indexes, among others.[100]

254.    On April 30, 2021, HUMBL announced that it hired Adam Wolfe as head of blockchain development at HUMBL, and noted that would be "working to deliver a seamless blockchain platform across HUMBL Mobile Pay, HUMBL Marketplace and HUMBL Financial." The press release noted that Wolfe has a technical background and made "voluntary contributions to several decentralized blockchain projects, such as BLOCKS and DigiByte."

255.    On October 15, 2021, HUMBL issued a press release announcing a strategic collaboration on blockchain-related initiatives with BLOCKS DAO.

256.    On November 29, 2021, HUMBL filed a preliminary registration statement on Form S-1 with the SEC. In the filing, HUMBL stated that:

HUMBL Financial recently announced the creation of its BLOCK ETX products to simplify digital asset investing for customers and institutions seeking exposure to a new, 24/7 digital asset class. We have launched this product in 100 countries outside the United States. HUMBL Financial has developed proprietary, multi-factor blockchain indexes, trading algorithms and financial services for the new digital asset trading markets to accommodate index, active and thematic investment strategies. BLOCK ETXs are completely non-custodial, algorithmically driven software services that allow customers to purchase and hold digital assets in pre-set allocations through their own digital asset exchange accounts. BLOCK ETXs are compatible for United States customers who have accounts with Coinbase Pro, Bittrex US or Binance US. BLOCK ETXs are also available to non-US customers who have accounts with Bittrex Global. BLOCK ETXs will be served first on the desktop and web version of the HUMBL platform, with the goal of future applications inside the HUMBL mobile application. HUMBL Financial is open to the licensing of the BLOCK ETXs to institutions and exchanges. HUMBL Financial also plans to offer trusted, third party financial services in areas such as

---

[100] 4.1.21 Press Release.

payments, investments, credit card services and lending across the HUMBL platform over time.

257.    On January 14, 2022, the SEC issued a letter to HUMBL and Defendant Foote stating that:

> We note the suite of products you offer called "BLOCK ETXs". These products look like they may create a separate program that could be viewed as an investment contract. Customers who hold digital assets through a digital asset trading platform can purchase one of these products, which is a computer algorithm through which the customer's digital assets are managed – i.e., the algorithm takes control of the trading of those digital assets and manages them based on the parameters of the particular algorithm's trading strategy. The products appear to be a trading program through which customers are relying on the operation of the program to generate profits from the implementation of a particular trading strategy. Even though the underlying instruments may not be securities, the program itself could be a security. Please provide your analysis as to whether the products are securities under Section 2(a)(1) of the Securities Act.

258.    On February 11, 2022, Defendant Foote issued a series of tweets that announced that the BLOCKS ETX products were being suspended:

- After additional dialogue with the SEC surrounding our S-1 filing, we have decided to take down our BLOCK ETX products.

- At HUMBL, we are one of the first public companies in blockchain to issue these kinds of products and sometimes our push for innovation will outpace regulation in terms of guidelines.

- We do not believe that our non-custodial, algorithmically driven, software-as-a-service BLOCK ETX subscription products are securities, nor that the underlying digital assets are securities.

- If you are a HUMBL Financial customer, no action is required of you. We will automatically cancel your subscription by 5:00 p.m. EST on February 18, 2022. We will also refund your monthly subscription fee for January and February 2022.

- Because we were never in custody of your digital assets, they remain in your digital exchange account and will not be affected by the cancellation of your subscription.

- While a majority of IP around digital assets is being developed here in the US, an estimated 95% of trading volume remains overseas. We hope to bring some of that business and liquidity home, as we work with regulatory partners to develop a compliant future for blockchain.

- The HUMBL Financial team is already hard at work on new blockchain-based product lines that have greater levels of potential licensing, regulatory clarity

and application. Thank you, as always for your support in these endeavors. #HUMBL

- Lastly, HUMBL has contractual obligations to get the S-1 approved, and it is important that we make it as simple as possible for the SEC to do so at this time.

259.    On February 14, 2022, HUMBL issued a press release entitled "HUMBL Suspends BLOCK ETX Subscription Products" announcing its suspension of the ETX subscription program. Defendant Foote stated, "We do not believe that our non-custodial, algorithmically driven, software-as-a-service- BLOCK ETX subscription products are securities, nor that the underlying digital assets are securities" adding that "after additional dialogue with the SEC surrounding our S-1 filing, we've determined this is the best path forward in the approval process."[101]

260.    By the time that the BLOCKS ETX sales were shut down, however, the damage had already been done and investors suffered significant losses based on the BLOCKS ETX purported trading strategies. For example, DigiByte (which Defendants had financial interest in separate from HUMBL) was a significant percentage of the BLOCK ETX portfolio allocation. After successfully offloading their DigiByte holdings by selling them to the BLOCK ETX, the value of those DigiByte holdings is down over 90% from its all-time high of $0.18 per token, which it hit on May 1, 2021, shortly after the launch of the BLOCKS ETX in the United States.

### J.  The BLOCK ETX Products Are Securities

261.    Under § 2(a)(1) of the Securities Act, a "security" is defined to include an "investment contract." 15 U.S.C. §77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Specifically, a transaction qualifies as an investment contract and, thus, a security if it is: (1) an investment; (2) in a common enterprise; (3) with a reasonable expectation of profits; and (4) to be derived from the entrepreneurial or managerial efforts of others. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975). This definition embodies a "flexible rather than a static principle, one that is capable of adaptation

---

[101] 2.14.22 Press Release.

to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," and thereby "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Howey*, 328 U.S. at 299. Accordingly, in analyzing whether something is a security, "form should be disregarded for substance," and the emphasis should be "on economic realities underlying a transaction, and not on the name appended thereto." *Forman*, 421 U.S. at 849.

262.    A "common enterprise" can be established under two frameworks: "horizontal" commonality and "vertical" commonality. "Horizontal commonality" examines the relationship among investors in a given transaction and typically includes a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis. "Vertical commonality" focuses on the community of interest between the individual investor and the manager of the enterprise (*i.e.*, the fortunes of the investor are interwoven with and depend on the efforts and success of those seeking the investment of third parties).

263.    Every purchase of BLOCK ETX products by a member of the public is an investment contract.

### i.    Investment of Money

264.    Defendants sold BLOCK ETX products to the general public through the HUMBL website.

265.    Investors who bought BLOCK ETX products invested fiat, including U.S. dollars, and digital currencies, such as Bitcoin and Ethereum, to purchase BLOCK ETX products.

### ii.    Common Enterprise

266.    The nature of HUMBL's business and Defendants' related actions establish the common enterprise element under both the horizontal and vertical commonality frameworks.

### *Horizontal*

267.    Retail investors shared the same relationship with HUMBL; they were all passive participants in the BLOCK ETX products' ecosystem and its rebalancing algorithm. Each Plaintiff

and Class Member who purchased a BLOCK ETX product pooled their contributions into the underlying digital assets based on that product's computer algorithm, and each Plaintiff and Class Member subsequently received distributions of profits and losses from those underlying digital assets on a pro-rata basis.

268.    Additionally, according to a section titled "HUMBL Financial Trading Algorithms Help Reduce Slippage and Fees" in the HUMBL Financial whitepaper, the Company disclosed how investors in the BLOCK Index ETX's purchase orders are pooled into large buy orders "to avoid slippage and generate much lower maker order fees as opposed to taker fees, which can reduce the profitability of the smart rebalancing." Then, "[u]pon the sale of a BLOCK ETX Index product, all assets can be sold at market prices to return Bitcoin, BLOCKS® or other another liquidation asset of choice to the investor." The pooling together of BLOCK ETX product buy orders to get a bulk discount on maker fees, and then giving that discount to investors on a pro-rata basis, establishes horizontal commonality.

*Vertical*

269.    The profits of each investor in BLOCK ETX products are inextricably intertwined with the Company and its executives.

270.    For example, the Company's annual Form 10-K report for 2022 ("2022 10-K") disclosed that HUMBL had used the revenue generated from the BLOCK ETX subscription fees (which retail investors paid on a monthly basis to gain access to, and financially benefit from, the HUMBL proprietary trading code) for the Company's business operations. In particular, the 2022 10-K reports states: "The Company commenced operations of the BLOCK ETX products in March 2021. The Company has reclassified the statement of operations for the year ended December 31, 2021 to reflect the subscription revenue and the direct expenses attributable to the BLOCK ETX product line that included direct payroll and direct subcontractor costs."

271.    Additionally, the success of the HUMBL Financial/BLOCK ETX ecosystem and its native token BLOCKS depended entirely on the efforts of the Company and its executives. These same Defendants also held a significant number of HUMBL financial products, including

HUMBL stock and the BLOCKS ETX, which gave them the same so-called "skin in the game" as Plaintiffs and Class members. In other words, Defendants held a significant stake in the HUMBL financial products, including the BLOCK ETX products, and thus shared in the profits and risks of the HUMBL Financial project.

272.    As such, these investments have constituted investments in a common enterprise because the fortunes of BLOCK ETX purchasers have been linked to each other or to the success of the Company's promotional efforts. The profits of each Plaintiff and Class member were intertwined with those of Defendants, thereby establishing the common enterprise element under the *Howey* test.

### iii.    Reasonable Expectation of Profits

273.    A purchaser of an asset may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market.

274.    Investors in the BLOCK ETX, including Plaintiffs and the Class, made their investment with a reasonable expectation of profits. The primary purpose of purchasing the Company's financial products was to make a profit or accumulate interest.

275.    "[P]rofits" include "dividends, other periodic payments, or the increased value of the investment." *S.E.C. v. Edwards*, 540 U.S. 389, 394 (2004). As described above, the various promotional materials disseminated by HUMBL and its executives informed investors that the Company was a for-profit entity whose objective was to capture market share for blockchain-related financial products and services. Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment in the BLOCK ETX.

276.    Additionally, each of the following characteristics (present here, as described above) have been recognized as being indicative of there being a reasonable expectation of profits:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
- The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other

positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

*        *        *

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted at expected users of the goods or services or those who have a need for the functionality of the network.

- The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

*        *        *

- The [Defendants are] able to benefit from [their] efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The [Defendants] continue[] to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of [Defendants] or [their] ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that [the Defendants] will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

    o   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.[102]

### iv.    Managerial Efforts

277.    Investors' profits in the BLOCK ETX tokens were to be derived from the managerial efforts of others – specifically the HUMBL, HUMBL Finance, and any HUMBL personnel responsible for the proprietary trading codes. BLOCK ETX investors relied on the managerial and entrepreneurial efforts of HUMBL, the Individual Defendants, and others to manage, oversee, and/or develop the BLOCK ETX program. Among other things, Defendants also were solely responsible for supporting the BLOCK ETX products and maintaining the proprietary algorithmic code. Retail investors had no ability to do this and thus had to solely rely on the efforts of Defendants to keep the BLOCK ETX ecosystem operational. Defendants' efforts to maintain the BLOCK ETX program and proprietary trading codes are significant as these managerial efforts materially affect the failure or success of the enterprise.

278.    BLOCK ETX investors would not have owned the proportion of shares that they did in the underlying digital assets if not for the BLOCK ETX product they purchased, and that product's algorithm controlled and managed the trading of the underlying digital assets based on the parameters of the algorithm's trading strategy.

279.    Based on Defendants' statements in marketing materials, investors would have reasonably expected the value of the BLOCK ETX to increase due to the significant efforts of HUMBL's management.  For example, on November 10, 2021, HUMBL issued a press release announcing that HUMBL had engaged Kellton Tech Solutions Limited to "assist the HUMBL technology team on the development of the HUMBL Pay Mobile App."  The press release further advised that "HUMBL's Chief Technology Officer, product managers, project managers, front-

---

[102] SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (2019) at §II(C)(2), https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets (the "SEC Framework"); *see also Coinbase, Inc. v. Sec. & Exch. Comm'n*, 126 F.4th 175, 184 (3d Cir. 2025) (relying, in part, on the SEC Framework, when analyzing whether a digital asset is an investment contract.)

end engineers, back-end engineers, QA team, and Sr. Technology Advisor will be joined by Kellton Tech in the development of several 'HUMBL Pay features,' including the 'BLOCK ETXs.'" Moreover, HUMBL announced that Kellton Tech would be "assigning up to 18 full-time resources across a suite of front-end engineers, back-end engineers, data architecture, quality assurance, UX/UI design and product management." Defendant Foote was also quoted in the press release, saying "We have appreciated Kellton's support work so far on HUMBL NFT Gallery and the HUMBL Pay product line and look forward to their agency taking a broader role within HUMBL to deliver these critical product lines." Investors had zero control on the scope or terms of Kellton's engagement and instead had to rely on HUMBL's management to both negotiate and oversee Kellton's efforts to deliver "critical product lines" like the BLOCK ETX.

280. These statements from HUMBL would have led a reasonable purchaser to view BLOCK ETX as an investment that would generate profits for investors without any effort on their part. Such profit would be the result of Defendants' efforts to create and commercialize the BLOCK ETX and any underlying digital assets included in the BLOCK ETX allocation, and the amount of profit, if any, would be entirely dependent on the Defendants following through on their promises to launch and maintain the HUMBL Financial ecosystem and BLOCK ETX.

281. The BLOCK ETX products are similar to the currently actively managed Bitwise 10 Crypto Index Fund ("Bitwise"), which invests in the top ten cryptocurrencies and is rebalanced monthly to account for changes in crypto prices.[103] These activities firmly establish the managerial efforts element. In fact, the key difference between the BLOCK ETX and Bitwise is that Bitwise was approved by, and is registered with, the SEC as a security. Because the BLOCK ETX products were not registered with the SEC, they had no ticker symbols and thus could not have shown up in the trading documents of Plaintiff or any other Class Member.

## **FALSE AND/OR MISLEADING STATEMENTS**[104]

---

[103]     https://www.fool.com/investing/stock-market/market-sectors/financials/cryptocurrency-stocks/cryptocurrency-etf/?msockid=105425655e556d4135cd30265f6f6ce0

[104] The particular portions of Defendants' statements alleged to be false and/or misleading are bold and italicized in this Section.

282. The Class Period begins on November 12, 2020 when, in announcing the reverse merger with Tesoro in a press release, HUMBL stated:

> **HUMBL has designed a mobile wallet (HUMBL)** and merchant software (HUMBL Hub), that help primarily cash economies migrate to digital money services across key vertical markets, such as: government, banking, wireless carriers and merchant services.
>
> * * *
>
> **The HUMBL® Mobile App delivers borderless transactions**, by integrating multiple currencies, payment methods, banks and financial services providers into one-click for the customer. **HUMBL® provides greater access and portability than US only mobile wallet providers, such as Venmo® and Zelle®.**[105]

283. The statements referenced in ¶282 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its mobile wallet's design was nowhere near complete and its App did not have even basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

284. HUMBL further stated in the 11.12.20 Press Release that:

> **HUMBL** maintains offices in San Diego (HUMBL - North America), Mexico (HUMBL – Latin America), Miami (HUMBL – Caribbean and Africa), and Singapore (HUMBL – Asia Pacific and Oceania Region) and **has created a global network of regional affiliates, who stand ready to implement sales and marketing programs in these corridors.**

285. The statement referenced in ¶284 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to HUMBL's business, which they knew or recklessly disregarded: that it's "global network of regional affiliates" consisted of one or two individuals in each city in which it maintained an office.

286. On November 17, 2020, HUMBL issued a press release announcing that Defendant Foote was going to "convert over 318 million shares recently purchased by him out of the retail market to a **new class of Preferred shares**."[106]

---

[105] 11.12.20 Press Release.
[106] 11.17.20 Press Release.

287.    The 11.17.20 Press Release further stated that:

Upon completion of the conversion, ***Tesoro's issued and outstanding number of common shares will have been reduced by over 860 million shares since Mr. Foote became President*** of Tesoro. ***The company does not anticipate that the number of common shares outstanding will increase during the remainder of 2020 and throughout 2021.***

288.    The statements referenced in ¶¶286-87 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that the new Class of Preferred shares were to be issued to Company insiders and family members which could be converted into over 5.5 billion shares of common stock beginning on December 3, 2021. And that conversion would severely dilute the value of the share of common stock that shareholders were holding.

289.    On November 24, 2020, HUMBL issued a press release touting Cyberbeat as "a ***leading*** digital payments and financial technologies company led by veteran digital payment industry executives of the Asia Pacific region" and the deal as an "opportunity to establish this global relationship with a ***proven winner*** in the Asia Pacific region[.]"[107]

290.    The 11.24.20 Press Release quotes Cyberbeat's CEO, Rajan S. Narayan, as stating that "***[w]e have seen a number of technology cycles over the decades at Cyberbeat.***"

291.    The 11.24.20 Press Release further quotes Defendant Garcia as stating that "***[t]he Cyberbeat team has helped Fortune 500 brands expand their footprint into this region for decades.***"

292.    The statements referenced in ¶¶289-91 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that Cyberbeat was a less than two-year-old company that appeared to only have two employees and could do little to help HUMBL expand into the Asia Pacific and Pan-India markets because its App did not have even basic functionality yet. Unsurprisingly, as of the date of this Complaint, neither the Company nor

---

[107] 11.24.20 Press Release.

Cyberbeat has announced any specific initiatives or expansion of HUMBL into Asia as result of their deal.

293.    On December 1, 2020, HUMBL issued the 12.1.20 Press Release entitled "***HUMBL Mobile App and HUMBL Hub Merchant Solutions Deliver Successful Pilot*** Transactions Between United States and Mexico" announcing that HUMBL "ha[d] delivered its first live transactions in the Mexico market."[108] The press release quotes Defendant Rivera as stating that "[u]nlike US only mobile wallets like Venmo® or Zelle, ® we designed HUMBL® so that ***it can go along with customers and merchants into places like Latin America, enabling them to transact with each other seamlessly in the new digital economy***."

294.    In addition, the 12.1.20 Press Release detailed that:

In the HUMBL brand video, which will be premiered at the Dec. 9 investor call, ***beta testers are seen transacting within the HUMBL® mobile wallet to digitally send, receive and exchange currencies across the border; as well as paying, tipping and transacting with merchants***.

In addition, ***HUMBL® showcases financial technologies such as USD Stablecoins***, which enable Latin American customers to avoid domestic currency fluctuations, by holding their money in US dollars on the blockchain in the HUMBL® mobile wallet.

* * *

***The HUMBL® Mobile App delivers borderless transactions***, by integrating multiple currencies, payment methods, banks, blockchain and financial services providers into one-click for the customer. ***HUMBL® provides greater access and portability than US only mobile wallet providers, such as Venmo® and Zelle®***…

295.    The 12.1.20 Press Release further quoted Fernando Cuevas, a HUMBL pilot test partner and lead affiliate sales representative in Baja: "***HUMBL® instantly makes life easier for me, my business and my customers here in Mexico***" and "[b]***eing able to pay for goods and services digitally with HUMBL®***, enables my customers to spend more time enjoying their trips, and less time seeking out ATM's and cash payment options everywhere we go."

296.    The statements referenced in ¶¶293-95 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining

---

[108] 12.1.20 Press Release.

to HUMBL's technology, which they knew or recklessly disregarded: that its mobile wallet did not have even basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

297.    On December 9, 2020, HUMBL issued a press release entitled "HUMBL Completes Merger with Tesoro Enterprises, Inc.; Sells Warrants with Provision for $50 Million in Funding" confirming that "*[t]he HUMBL® Mobile App delivers borderless transactions*, by integrating multiple currencies, payment methods, banks, blockchain and financial services providers into one-click for the customer. *HUMBL® provides greater access and portability* than US only mobile wallet providers, such as Venmo® and Zelle®…"[109]

298.    Then, after markets closed on December 9, 2020, HUMBL held its first conference call with investors. During that 12.9.20 Investor Call, Defendant Foote asked a question from the point of view of a shareholder and answered it:

> *I'm a shareholder. What do you guys have built right now?*
>
> *Right now, in the barn, we have – send money, request money, receive money, exchange money, Stable coins*.[110]

299.    Foote further described during the 12.9.20 Investor Call:

> If you're a merchant in like a currency fluctuation zone like Latin America, for example, where you see countries where their currency fluctuates 25% to the downside versus the dollar, these are very real tools that are critical for folks to be able to park their money into USD Stablecoins and things like that. *We have that capability*, and as we get regulatory clearances from different countries and domiciles, we'll be moving quickly on that as well.
>
> * * *
>
> You go down to Mexico, you can't even buy a snickers bar without going to the ATM, getting cash out, half these paper bills you come home with, you don't even need them. It's very inconvenient and the younger audiences that we test

---

[109] Press Release, GlobeNewswire, *HUMBL Completes Merger with Tesoro Enterprises, Inc.; Sells Warrants with Provision for $50 Million in Funding* (Dec. 9, 2021), https://www.globenewswire.com/en/news-release/2020/12/09/2142305/0/en/HUMBL-Completes-Merger-with-Tesoro-Enterprises-Inc-Sells-Warrants-with-Provision-for-50-Million-In-Funding.html (last visited Sept. 22, 2022).

[110] 12.9.20 Investor Call at 00:25:24.

with, as well as the merchants that seek to serve them both natively and those traveling in from abroad want to use a mobile wallet that is multicurrency and multi-asset, and gives them the ability to, in a contactless capacity, point in pay. *We've built that* and you'll see that in the film.[111]

300.    Also, during the 12.9.20 Investor Call, Foote confirmed that:

*We have CRM features, meaning we can take any offline cash only dead tech merchant who's like, 'I just want to be able to take credit cards or bank accounts.' We can turn them int a digitally connected consumer relationship management merchant within a day.*[112]

*  *  *

I challenged our Mexico sales team. I said 'Go sign up a hundred merchants in a week.' *They came back with 300 merchants in three days.*[113]

301.    The statements referenced in ¶¶297-300 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its mobile wallet's design was nowhere near complete and the App did not have even basic functionality at the time. As such, regardless of the number of merchants HUMBL's sales team signed up, the Company was in no position to be able to actually generate revenue.

302.    On December 14, 2020, HUMBL issued a press release entitled "HUMBL Announce Launch of Holiday Deal Days"[114] touting that:

*Upon signing up for a HUMBL® Pay account, customers will be able to shop the HUMBL Marketplace* for highly curated holiday deals, coupon codes and affiliate discount links in shopping verticals like electronics, health, beauty, home, fashion, fitness, and kids.

*The HUMBL Deal Days campaign enables HUMBL® Pay global customers to shop online hassle-free* by locating the best deals on the internet while avoiding broken links, fake merchandise and expired coupon codes.

303.    The statements referenced in ¶302 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to

---

[111] *Id.* at 00:19:08.
[112] *Id*. at 00:25:50.
[113] *Id.* at 00:26:24.
[114] Press Release, GlobeNewswire, *HUMBL Announces Launch of Holiday Deal Days* (Dec. 14, 2020), https://www.globenewswire.com/en/news-release/2020/12/14/2144563/0/en/HUMBL-Announces-Launch-of-Holiday-Deal-Days.html (last visited Sept. 22, 2022).

HUMBL's technology, which they knew or recklessly disregarded: that its mobile wallet did not have even basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

304.    On January 22, 2021, in a letter to shareholders, Defendant Foote boasted that the Company had secured "***our first of multiple option payments on the distribution rights deal in Oceania region***" with "***plans to enter the region with this group***."[115] It was later announced that TGP had paid $600,000 in December for 12.5 million warrants at $1 each and an option to purchase territory rights, with plans to invest an aggregate $15 million.

305.    The statements referenced in ¶304 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that TGP could do little to help HUMBL expand into the Oceania region because its App did not have even basic functionality yet. Unsurprisingly, as of the date of this Complaint, neither the Company nor TGP has announced any specific initiatives or expansion of HUMBL into the Oceania markets as result of their deal.

306.    Later that day, HUMBL held its second conference call with investors ("1.22.21 Call"). During the call, Defendant Foote assured investors that:

> We wanted to just show that ***we're a promises made, promises kept organization.*** I think ***we're really on track with everything that we promised to the shareholders, if not ahead of schedule bumping up the Q1 app release likely in February and then migrating into other service loads***, like peer-to-peer, HUMBL Hubs…

307.    The statements referenced in ¶306 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its App did not even have basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

---

[115] 1.22.21 Shareholder Letter.

308. On February 25, 2021, HUMBL issued a press release entitled "HUMBL, Inc. Completes Corporate Actions" which continued to confirm that "[t]he HUMBL® Mobile App delivers more seamless global transactions, by integrating multiple currencies, payment methods and financial services into one-click for the customer, beyond primarily US only mobile wallet providers such as Zelle® and Venmo®."[116]

309. The statement referenced in ¶308 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its App did not even have basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

310. The corporate actions announced in the 2.25.21 Press Release included "the creation of restricted preferred classes of shares which will be issued to former members of HUMBL, LLC and prospective investors of HUMBL. The authorized number of shares stated reflects these preferred shares on a presumed fully diluted basis."

311. The 2.25.21 Press Release further quoted Defendant Hinshaw to explain the basis of the reverse split:

> *The company's Board of Directors concluded that it was important to quell the volatility in the share price*. Prospective investors and current shareholders were concerned that it was difficult to pinpoint the true value of the common shares. Furthermore, this will force any outstanding short positions to cover their position. *The board was also sympathetic to the need not to wipe out the holdings of the shareholders, and therefore determined that this small reverse split would satisfy both requirements.*

312. Then, after markets closed on February 26, 2021, HUMBL held its third investor conference call. During that 2.26.21 Investor Call, Defendant Sharp assured investors that: "If you're worried about dilution, don't be."[117]

---

[116] 2.25.21 Press Release.
[117] 2.26.21 Investor Call at 00:09:23.

74

313.    The statements referenced in ¶¶311-12 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that the new "restricted preferred classes of shares" could be converted into over 5.5 billion shares of common stock beginning on December 3, 2021. And that conversion would severely dilute the value of the shares of common stock that shareholders were holding.

314.    In addition, during the 2.26.21 Call, Defendant Foote reiterated that "*We're tracking very well to continue to release this product in quarter two*, as stated in our first month one and month two conference calls."

315.    The statement referenced in ¶314 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its App did not have even basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

316.    On March 16, 2021, HUMBL issued a press release entitled "HUMBL, Inc. Announces Aurea Group Ventures Investment and Partnership for Exclusive Chile Country Rights"[118] ("3.16.21 Press Release") touting that:

> **HUMBL and Aurea Group are already underway on HUMBL Latin America business development discussions** in key verticals such as: banking, merchant and financial services, real estate, hospitality, tourism, sports, festivals, entertainment and ticketing services in the region.

317.    The statement referenced in ¶316 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that Aurea Group could do little to help HUMBL expand into Latin America because its App did not have even basic functionality yet. Unsurprisingly, as of the date of this Complaint, neither the Company nor Aurea Group has

---

[118] 3.16.21 Press Release.

announced any specific initiatives or expansion of HUMBL into Latin America as result of their deal.

318.    On April 16, 2021, HUMBL issued a press release announcing that the HUMBL's Mobile App – available after 2PM PT that day – would:

> *allow customers to discover merchants; as well as pay, tip, rate and review those same merchants* in contactless transactions.
>
> *The company has also integrated ticketing into the HUMBL Pay mobile application*, for customers seeking to find and purchase tickets to live events; *as well as click-through to HUMBL Financial Services, along with third party credit and lending offers* (US only).[119]

319.    The statements referenced in ¶318 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to HUMBL's technology, which they knew or recklessly disregarded: that its App did not even have basic functionality at the time. Indeed, HUMBL did not have a fully functional app until July 15, 2022 when it launched HUMBL Wallet on Android, followed by an iOS launch on July 21, 2022.

320.    On April 20, 2021, Defendant Foote tweeted that "I will commit to not selling any of those personal shares for the entirety of Calendar Year 2021-2022."[120]

321.    The statement referenced in ¶320 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that Defendant Foote's parents hold over 335 million shares via the Stephen L. and Sandra M. Foote Revocable Trust.

322.    During the investor conference call on May 7, 2021 ("5.7.21 Investor Call"), Defendant Foote explained that:

> *We are driving revenues* across all three of our business lines so subscription revenues through the ETXs, transaction revenues, *ticketing*, vendors, and *NFTs*. If you look at top shots in the NBA doing $350 million a month on NFTs, there are hundreds of professional sports leagues around the world, we are having incredibly compelling discussions in key verticals of NFTs, sports, gaming, photography,

---

[119] 4.16.21 Press Release.
[120] Brian Foote, (@humbleceo), Twitter (Apr. 20, 2021, 9:30 AM), https://twitter.com/humbleceo/status/1384499644147720201.

entertainment, previous catalogs.

* * *

[W]e need to start working the revenues and the fundamentals and getting into a process of building a very lasting business. Part of the way we will do that is through the ticketing piece. ***The Tickeri side, they have already achieved one of their post-COVID goals, which was to achieve $1 million in gross ticket sales over the last 30-day rolling period.*** Sorry for that typo there. ***In gross ticket sales over the last 30-day rolling period, aligning well across Mobile Pay and NFTs, a 33% increase in ticketing sales over the previous 30-day period.***[121]

323.    During the investor conference call on June 30, 2021 ("6.30.21 Investor Call"), Defendant Foote touted that:

We completed two acquisitions, so Tickeri, Monster Creative an incredible Hollywood studio doing some of the best work in the world creatively that will service on NFTs, ticketing, multimedia content, all the things that we're trying to do as a platform. … ***They're super accretive.***[122]

* * *

Then ***we're driving sales volume, so revenues***. We'll be doing revenues of transaction volumes of over a million dollars a month already at HUMBL in our first full quarter as a business, so revenues.[123]

324.    The statements referenced in ¶¶322-23 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to HUMBL's business, which they knew or recklessly disregarded: that Tickeri had been overvalued, requiring a goodwill write-down of over $12M, and that neither HUMBL's ticketing platform and NFT service were generating significant revenue despite their high cost to the Company and shareholders.

325.    Defendant BF Borgers played a crucial role in ensuring the accuracy and compliance of financial information presented during the 5.7.21 and 6.30.21 Investor Calls.

**THE TRUTH EMERGES**

326.    The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the class members they represent.

---

[121] 5.7.21 Investor Call, at 00:33:06, https://support.humbl.com/investors/investor-call.

[122] 6.30.21 Investor Call, at 00:55:36, https://support.humbl.com/investors/investor-call.

[123] *Id.* at 00:54:36.

327.    The truth began to be revealed when, after markets closed on April 14, 2021, HUMBL issued its Annual Report which revealed that the 552,522 shares of newly created Series B Preferred Stock from the reverse merger with Tesoro each "shall be convertible at the option of the holder thereof at any time after December 3, 2021…into ten thousand (10,000) fully paid and nonassessable shares of common stock."[124]

328.    Then, before markets opened on April 18, 2021, Gold Panda, a Seeking Alpha analyst, published a research report entitled "HUMBL – I'm Even More Bearish After the Release of 2020 Results."[125] The 4.18.21 SA Report analyzing the Annual Report and concluded that if "all Series B preferred shares are converted, HUMBL is valued at $16.9 billion" despite "barely any investment in development and just $1.8 million of assets as of December."

329.    As the market absorbed this news, shares of HUMBL fell over 53%, or $1.545, from a close of $2.895 on April 14, 2021 to $1.35 on April 20, 2021, on unusually heavy trading, damaging investors.

330.    The truth was further revealed before markets opened on May 20, 2021 through the Hindenburg Report. Among other issues, the Hindenburg Report revealed that: (i) HUMBL, among other issues, had "failed to deliver on even the most basic aspects of its business plan, including features it claimed were completed months ago. Six months after going public, its users can't send or receive money on its 'payment' app" and (ii) "international deals announced over the last year – a key source of the company's perceived legitimacy – never got off the ground or have quietly collapsed behind the scenes." Those deals included the collapse of the "landmark $15.6 million deal to sell rights to HUMBL's business in 15 countries in Oceania, including Australia and Tonga," the "investment by a Singaporean company into HUMBL's Asia business [which] hasn't resulted in any specific initiatives 6 months later," and the purported "expansion into Mexico, where HUMBL's CEO boasted of recruiting 300 merchants in 3 days, has only 2 merchants listed as accepting payments [who] aren't currently accepting HUMBL payments; the

---

[124] Annual Report at 31.
[125] 4.18.21 SA Report

business in Mexico is on hold pending changes to the platform, according to a local merchant working with the company."

331.    On this news, shares of HUMBL fell over 12%, to close at $0.7654 on May 20, 2021 on unusually heavy trading, damaging shareholders.

332.    As another analyst at Seeking Alpha reported in an article entitled "HUMBL falls after new short report from Hindenburg Research (update)" on May 20, 2021, the price of HUMBL shares had at that time "dropped 6.9% after a new short report from Hindenburg Research."[126] The article recognized the Hindenburg Report as "claim[ing] that after six months of going public users of fintech company's app can't send or receive money on its 'payment' app. It also argues that the 'vast majority' of merchants that appear on HUMBL's 'Pay' platform don't accept HUMBL Pay."

333.    Then, after markets closed on August 16, 2021, HUMBL issued its Quarterly Report for the period ending June 30, 2021 which revealed that HUMBL's goodwill had been written down to $16.5M as of June 30 just months after acquiring $20.1M in goodwill from Tickeri and $8.5M in goodwill from Monster Creative. Most notably, $12.1M of the Tickeri goodwill had been written off.

334.    Then, before markets opened on August 18, 2021, Gold Panda, a Seeking Alpha analyst, published a research report entitled "HUMBL Closes Another Humbling Quarter and I Remain Bearish" (8.18.21 SA Report). After analyzing the 8.16.21 Quarterly Report, the SA Report noted that "Tickeri and Monster Creative had combined revenues of less than $1 million in H1 2021", the expected "much higher revenues as a result of its mobile payments app in the middle of April or its pivot to the non-fungible token (NFT) market" never materialized, and the "$12.1 million impairment expenses" from the Tickeri and Monster creative Project deals "[wa]s really bad as it pushed[] … shareholders' equity into negative territory."

---

[126] 5.20.21 SA Report.

335.    As the market absorbed this news, shares of HUMBL fell over 13%, or $.111, from a close of $0.806 on August 16, 2021 to $0.695 on August 19, 2021, on unusually heavy trading, damaging investors.

336.    The truth was fully revealed after markets closed on November 17, 2021 through the 11.17.21 SA Report. That report aggregated and analyzed HUMBL's financial situation, concluding that "HUMBL has a pattern of promising to disrupt an industry, launching a product that barely generates any revenues and then pivoting to another sector." The report laid out why the new products HUMBL announced in September, NFT and ticketing platforms, will not perform "considering how bad its other products have done." The report also revealed the litigation risk facing the Company based on the high interest in "a website named humblelawsuit.com…that says it's exploring options for class action representation."

337.    On this news, shares of HUMBL fell over 16%, to close at $0.4026 on November 18, 2021 on unusually heavy trading, damaging shareholders.

## ADDITIONAL SCIENTER ALLEGATIONS

338.    As alleged herein, Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public. Defendants substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding HUMBL, their control over, and/or receipt and/or modification of HUMBL's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning HUMBL, participated in the fraudulent scheme alleged herein.

339.    The Individual Defendants had actual knowledge of HUMBL's strategy for the reverse merger with Tesoro and structuring of the different classes of shares at the time they were occurring. Their own public statements indicated their personal involvement and knowledge:

- 12.9.20: "The HUMBL team and the Tesoro public vehicle were a perfect match, and *we laid out a plan to bring the two together and everybody followed the plan to a tee which is a credit to Brian [Foote]* and his group. (Sharp)

- 12.9.20: "It goes without saying that *George [Sharp] was incredible at getting us into the OTC markets*. …We knew it takes an average of five to seven years to get onto the NASDAQ and we saw tech starting to run through the same five venture capital firms, same five mega techs, same five investment backs in New York, and I said 'Okay, well, what can we do here to do something really fresh and not only for the brand … but also do something from a capital markets prospective that was super disruptive and got back to the basic so early stage technology being available for anybody to invest in.' We appreciate that opportunity. Thank you George." (Foote)[127]

- 2.26.21: "A lot of people that would have taken over the TSNP vehicle would have done a 1 for 10,000, a 1 for 100,000, wiping out the existing shareholders. We did a very small reverse split …*We picked the number one for four as our personally said* because we wanted to appease the shareholders." (Sharp)[128]

340.    Defendant Sharp's own statements further demonstrated his knowledge of what HUMBL shareholders consider material and indeed, his admission that he withheld information in order to manage the Company's stock price. Specifically, during the 2.26.21 Call with investors, Defendant Sharp stated:

> We received a number of comments about how some certain people would have wished that we had announced that we were doing to do this reverse split sooner. In other words, we should have told you a week ago or two weeks ago. *I made the conscious decision that we were not going to tell you*. I'll tell you why.

> It would've created mass panic. Some of you would've sold your stock, which is fine, but the problem is, with a mass panic, instead of selling your stock at a dollar, 90 cents, 80 cents, 70 cents, you probably would've ended up selling, a lot of you, selling it for 40 cents. I don't want to sound like I'm your mother, but we saved a lot of you from yourselves here.

341.    Likewise, the Individual Defendants' public statements indicated that they had actual knowledge of the capabilities of HUMBL's touted technology at any given point in time:

- 12.9.20: "*Right now, in the barn, we have – send money, request money, receive money, exchange money, Stable coins*. … *From a merchant perspective, you can text an order, do contactless payments, rate and review your experience at the merchant. __We have CRM features,__* meaning we can take any offline cash only dead tech merchant who's like, 'I just want to be able

---

[127] 12.9.20 Investor Call at 00:07:13.
[128] 2.26.21 Investor Call at 00:03:35.

to take credit cards or bank accounts.'" (Foote)

- 1.22.21: "*[W]e're really on track with everything that we promised to the shareholders, if not ahead of schedule bumping up the Q1 app release likely in February* and then migrating into other service loads, like peer-to-peer, HUMBL Hubs..." (Foote)

- 2.26.21: "*We're tracking very well to continue to release this product in quarter two*, as stated in our first month one and month two conference calls." (Foote)

- 2.26.21: "[N]ano merchants, we're in the final mile of a discussion with an ex Google group from Asia that's developing a merchant listings platform for nano merchants and influencers to be able to monetize themselves as brands. *We're excited to potentially announce that platform over the next coming 7 to 10 days*.

  Again, nothing guaranteed, but we think *we're on track to build in a nano merchant platform* inside this, that will be novel for creators, influencers." (Foote)

- 6.30.21 "I want to be clear *we remain on track for trying to execute a stable coin thesis within peer-to-peer that requires a custodial wallet* excitingly. We're going to be adding by crypto and earn interest up to 6%." (Foote)

342.    Lastly, the Individual Defendants closely followed HUMBL's stock price, *see, e.g.,* 2.26.21 Investor Call (Sharp: "[Y]ou in fact had a tremendous increase in the value of your stock today ... We closed at 85 cents yesterday, and opened at $3.40."), and relied on the value of its stock in order to conduct acquisitions, *see, e.g.,* 7.7.21 Press Release (Foote's "retired shares are sufficient to cover the shares that have been or will be issued in connection with the completed Tickeri and Monster LA acquisitions, HUMBL Brand Ambassadors, HUMBL Strategic Advisors and HUMBL Strategic Collaborations such as Athletes First, Glushon Sports Management and Pilgrimage Festival"). Accordingly, the Individual Defendants had to have been aware of the increase in the stock price each time a new deal was announced. *See, e.g.*, *supra* at ¶¶ 46, 58, 61, 108, 113, 126-27, 133, 135, 139, 147. As a result, they knew or recklessly disregarded that information about any deal falling through or failing – information which they had access to – was material to investors and thus concealed that information from investors in order to artificially maintain or inflate the Company's stock price. During the Class Period, the Individual Defendants

82

were only able to manipulate HUMBL's stock price because the market for its stock efficiently and effectively responded to their public statements about the Company.

## CLASS ALLEGATIONS

343.    Plaintiffs bring this action, individually, and on behalf of nationwide classes, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> All persons who, during the Class Period, purchased HUMBL common stock between November 21, 2020 and November 17, 2021, both dates inclusive, and were subsequently damaged thereby.

> [and]

> All persons who, during the Class Period, purchased HUMBL BLOCK ETX products between November 21, 2020 and February 14, 2022, both dates inclusive, and were subsequently damaged thereby.[129]

344.    Excluded from the Classes are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above, based on discovery and further investigation.

345.    Numerosity: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Classes is currently unknown, such information being in the sole possession of HUMBL and/or third parties and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Classes consists of at least hundreds of people. The number of Class members can be determined based on HUMBL's and other third party's records.

---

[129]    Plaintiffs reserve the right to expand or amend the Class Period based on discovery produced in this matter.

346.    Commonality: Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

whether Defendants made false and/or misleading statements;

whether the BLOCK ETX products are securities under the Securities Act;

whether the sale of BLOCK ETX products violates the registration requirements of the Securities Act;

whether Defendants improperly and misleadingly marketed BLOCK ETX products; and

whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

347.    Typicality: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs' and Class members' claims all arise out of HUMBL's uniform misrepresentations, omissions, and unlawful, unfair, and deceptive acts and practices related to the sale of BLOCK ETX products.

348.    Adequacy: Plaintiffs have no interest that conflicts with the interests of the Classes and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

349.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to effectively redress the wrongs done to them. Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would increase delay and expense to all parties, and to the court system,

because of the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

350.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## PRESUMPTION OF RELIANCE

351.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) HUMBL stock was traded in an efficient market during the Class Period in that its price responded quickly to new information;

(d) the Company's stock was highly liquid and actively traded during the Class Period, with an average weekly trading volume of 75,293,771 shares – which was over 6.6% of the outstanding shares;

(e) the Company's securities traded in the OTCMKT in the United States;

(f) the Company was covered by at least two securities analysts;

(g) HUMBL was well-followed by investors through websites with sections solely devoted to HUMBL, including InvestorsHub[130], StockTwits[131] and YahooFinance[132];

---

[130]   HUMBL Inc (HMBL) Stock Message Board | InvestorsHub, https://investorshub.advfn.com/HUMBL-Inc-HMBL-14605
[131]   Humbl Inc (HMBL) Stock Price Today, Quote, Latest Discussions, Interactive Chart and News, https://stocktwits.com/symbol/HMBL
[132]   HUMBL, Inc. (HMBL) Stock Forum & Discussion - Yahoo Finance, https://finance.yahoo.com/quote/HMBL/community/

(h) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(i) Plaintiffs and members of the Classes purchased, acquired, and/or sold HUMBL securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed without knowledge of the omitted or misrepresented facts.

352.    Based upon the foregoing, Plaintiffs and the members of the Classes are entitled to a presumption of reliance upon the integrity of the market.

353.    Alternatively, Plaintiffs and the members of the Classes are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute *Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION
### § 10(b) and Rule 10b-5
### (Against All Defendants)

354.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

355.    This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

356.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Classes; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of HUMBL

securities; and (iii) cause Plaintiffs and other members of the Classes to purchase or otherwise acquire HUMBL securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

357.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, SEC filings, press releases, and other statements and documents, as described above, including statements made to securities analysts and the media, that were designed to influence the market for HUMBL securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about HUMBL's business and operations.

358.    By virtue of their positions at HUMBL, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Classes, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

359.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control. As senior managers and/or directors of HUMBL, the Individual Defendants had knowledge of the details of HUMBL's internal affairs.

360.    The Individual Defendants are liable both directly and indirectly for the wrongs complained about herein. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of HUMBL. As officers and/or directors of a publicly held company, the Individual Defendants had duties to disseminate timely, accurate, truthful, and complete information with respect to

HUMBL's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of HUMBL securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning HUMBL's business and financial condition, which were concealed by Defendants, Plaintiffs and other members of the Classes purchased or otherwise acquired HUMBL securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or statements disseminated by Defendants, and were damaged thereby.

361.    During the Class Period, HUMBL securities were traded in an active and efficient market. Plaintiffs and the other members of the Classes, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired HUMBL securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Classes known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Classes, the true value of HUMBL securities was substantially lower than the prices paid by Plaintiffs and the other members of the Classes. The market price of HUMBL securities declined sharply upon public disclosure of the facts alleged herein causing injury to Plaintiffs and Class members.

362.    By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

363.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Classes suffered damages in connection with their respective purchases, acquisitions, and sales of HUMBL's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## SECOND CAUSE OF ACTION
Violations of §20(a) of the Exchange Act
(Against the Individual Defendants)

364.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

365.    During the Class Period, Defendants Foote, Sharp, and Hinshaw participated in the operation and management of HUMBL and conducted and participated, directly and indirectly, in the conduct of HUMBL's business affairs. Because of their senior positions, the Individual Defendants knew the adverse non-public information about HUMBL's current financial position and future business prospects.

366.    As officers and/or directors of a publicly owned company, the Individual Defendants had duties to disseminate accurate and truthful information, with respect to HUMBL's business practices, and promptly correct any public statements issued by HUMBL that had become materially false or misleading.

367.    Because of their positions of control and authority as senior directors or officers and executive team members, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that HUMBL disseminated in the marketplace during the Class Period concerning the Company's business, operational, and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause HUMBL to engage in the wrongful acts complained about herein. The Individual Defendants, therefore, were "controlling persons" of HUMBL within the meaning of §20(a) of the Exchange Act. In this capacity, the Individual Defendants participated in the unlawful conduct alleged herein that artificially inflated the market price of HUMBL securities.

368.    The Individual Defendants, therefore, acted as controlling persons of HUMBL. By reason of their senior management positions and/or being directors of HUMBL, the Individual Defendants had the power to direct the actions of, and exercised the same to cause HUMBL to engage in the unlawful acts and conduct complained about herein. The Individual Defendants exercised control over the general operations of HUMBL and possessed the power to control the

specific activities that comprise the primary violations about which Plaintiffs and the other members of the Classes complain.

369.    By reason of the above conduct, Defendants Foote, Sharp, and Hinshaw are liable pursuant to §20(a) of the Exchange Act for the violations committed by HUMBL.

### THIRD CAUSE OF ACTION
Violations of § 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder
(Against the Individual Defendants)

370.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

371.    This cause of action is asserted against the Individual Defendants.

372.    During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase HUMBL securities at artificially inflated and distorted prices; and (3) cause Plaintiffs and other members of the Class not to sell HUMBL securities until the Individual Defendants and other Company insiders could sell HUMBL securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants made the false statements alleged herein.

373.    The Individual Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent the true financial condition of HUMBL and conceal adverse material information about the business, operations and future prospects of HUMBL as specified herein.

374.    The Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HUMBL's revenue, income, value and performance and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about HUMBL and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers HUMBL securities during the Class Period.

375.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The material misrepresentations and/or omissions made by the Individual Defendants were done knowingly or recklessly and for the purpose and effect of concealing HUMBL's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the false and misleading statements of the Individual Defendants during the Class Period, if they did not have actual knowledge of the misrepresentations and omissions alleged, were highly reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

376.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for HUMBL's securities was artificially inflated during the Class Period.

377.    In ignorance of the fact that market prices of HUMBL's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired HUMBL's securities during the Class Period at artificially high prices and were damaged thereby.

378.    At the time of said misrepresentations and omissions, Plaintiffs and the other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other

Class members and the marketplace known the truth regarding HUMBL's financial results and condition, Plaintiffs and the other Class members would not have purchased or otherwise acquired HUMBL's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they did.

379.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

380.    As a direct and proximate result of the wrongful conduct of the Individual Defendants, Plaintiffs and the other Class members suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

381.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## FOURTH CAUSE OF ACTION
### Unregistered Offering and Sale of Securities in
### Violation of §§ 5 and 12(a)(1) of the Securities Act
### (Against All Defendants)

382.    Plaintiffs restate and reallege all preceding allegations above as if fully set forth herein.

383.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

384.    BLOCK ETX products are securities within the meaning of § 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

385.    Plaintiff Pasquinelli and members of the Classes purchased BLOCK ETX securities.

386.    No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein. No exemption to the registration requirement applies.

387.    SEC Rule 159A provides that, for purposes of § 12(a)(2), an "issuer" in "a primary offering of securities" shall be considered a statutory seller. 17 C.F.R. §230.159A(a). The Securities Act, in turn, defines "issuer" to include every person who issues or proposes to issue any security. 15 U.S.C. §77b(a)(4). HUMBL is an issuer of BLOCK ETXs.

388.    The U.S. Supreme Court has held that statutory sellers under §12(a)(1) also include "the buyer's immediate seller" and any person who actively solicited the sale of the securities to plaintiff and did so for financial gain. *See Pinter v. Dahl*, 486 U.S. 622, 644 n.21 & 647 (1988); *accord, e.g., Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). That is, §12(a)(1) liability extends to sellers who actively solicit the sale of securities with a motivation to serve their own financial interest or those of the securities owner. *Dahl*, 486 U.S. at 647; *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). HUMBL and the Individual Defendants are all statutory sellers.

389.    By reason of the foregoing, each of the Defendants have violated §§ 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§77e(a), 77e(c), and 77l(a).

390.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs and the Classes have suffered damages in connection with their BLOCK ETX purchases.

## PRAYER FOR RELIEF

391.    WHEREFORE, Plaintiffs, individually, and on behalf of all others similarly situated, respectfully request that this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 and issue an order certifying one or more of the Classes defined above;

B.    Appoint Plaintiffs as representatives of the Classes and their counsel as Class counsel;

C.    Declare that the Company and Individual Defendants made false and misleading statements with scienter, proximately causing Plaintiffs' losses;

D.    Declare that the Company and Individual Defendants offered and sold unregistered securities in violation of §§ 5(a), 12(a), and 15 of the Securities Act;

93

E.      Award all actual, general, special, incidental, statutory, rescission, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

F.      Award post-judgment interest on such monetary relief;

G.      Grant appropriate injunctive and/or declaratory relief;

H.      Award reasonable attorneys' fees and costs; and

I.      Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, individually and on behalf of the putative Class, demand a trial by Jury on all issues so triable.

Dated: April 10, 2025                Respectfully submitted,

**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

*/s/ Paige J. Alderson*
Paige J. Alderson (Reg. No. 006384)
222 Delaware Avenue, Suite 1050
Wilmington, DE 19801
Telephone: (302) 578-7345
Email: palderson@scott-scott.com

John T. Jasnoch (*admitted pro hac vice*)
Mollie Chadwick (*pro hac vice forthcoming*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: jjasnoch@scott-scott.com
          mchadwick@scott-scott.com
*Co-Lead Counsel for Lead Plaintiffs and the Class*

**FREEDMAN NORMAND FRIEDLAND LLP**
Ivy T. Ngo (*admitted pro hac vice*)
Velvel (Devin) Freedman (*admitted pro hac vice*)
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131

Telephone: (786) 924-2900
Facsimile: (646) 392-8842
Email: ingo@fnf.law
        vel@fnf.law

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein (*admitted pro hac vice*)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Alfred Miller*